UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RICHARD HERNANDEZ, STEVE HERNANDEZ
AND MARIA KEEGAN,

                                     Plaintiffs,            COMPLAINT
                                                 AND JURY DEMAND

   v.

THE MONEY SOURCE INC.
                                   Defendant.
-------------------------------------------------------------------X

     The Plaintiffs, by their attorneys, Law Offices of Lauren Goldberg, PLLC, as and for their complaint against the Defendant allege:

NATURE OF CLAIMS

1. Plaintiffs were employed as a regional sales manager and mortgage loan officers by Defendant and bring this action for fraud in the inducement, breach of contract and for violations of the Dodd Frank Consumer Financial Act, 12 U.S.C. §5567.

2. During the summer of 2016, Defendants knowingly made false misrepresentation to the Plaintiffs in order to lure them away from their current job and entice them to work for The Money Source.

3. As a result of Defendant's intentionally false misrepresentations, Plaintiffs suffered significant economic loss and career harm.

4. Once Plaintiffs began working for Defendant, they not only realized that they were lied to about material facts, but they become aware that The Money Source was violating various rules and regulations from the Consumer Financial Protection Bureau.

1

5. After the Defendant fired them for complaining about these violations, the Defendant refused to pay them their proper commissions to which they were owed pursuant to their employment agreement.

## JURISDICTIONAL STATEMENTS

6. This Court has jurisdiction over the claims presented in this complaint pursuant to 28 U.S.C. § 1331 and 1367 and 12 U.S.C. § 5567(c)(4)(D).

7. Plaintiff invokes supplemental jurisdiction of the Court to hear and decide the claims arising under state law.

8. Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §1391 in that the actions or omissions that gave rise to this lawsuit occurred in this district.

## PROCEDURAL REQUIREMENTS

9. The Plaintiffs filed a complaint with the USDOL on February 6, 2017 alleging that their termination violated 12 U.S.C. § 5567. Since the USDOL has not issued a final order in regard to Plaintiffs' complaint within the 210 days of them filing the complaint, the Do Plaintiffs have now filed the instant complaint pursuant to 12 U.S.C. §5567(c)(4)(D)(i).

## PARTIES

10. Plaintiff Richard Hernandez resides in Carle Place, New York which is in Nassau County.

11. Plaintiff Steve Hernandez resides in Queens, New York.

12. Plaintiff Maria Keegan resides in East Northport, New York.

13. The Money Source Inc. (hereinafter "The Money Source") is a mortgage lending business which has its principal place of business at 135 Maxess Road, Melville New York 11747.

14. Upon information and belief, The Money Source has over 400 employees in the United States.

15. Upon information and belief, The Money Source provides consumer financial products or services as defined by 12 U.S.C. 5481(5) and is thus a covered person within 12 USC 5481(6), and/or provides material services to a covered person in connection with the offering or provision of those consumer financial products or services, as is thus a service provider as defined by 12 U.S.C. §5481(26).

<u>STATEMENT OF FACTS</u>

16. Richard Hernandez, Steve Hernandez and Maria Hernandez were all working at New Penn Financial ("New Penn") in July 2016.

17. In July 2016, Richard Hernandez had been working at New Penn Financial for almost 7 years and held the title of Senior Sales Manager.  As a Senior Sales Manager, he had 16 people reporting to him.  Mr. Hernandez received override commissions for all the individuals reporting to him.  He was earning approximately $25,000/month.

18. Steve Hernandez had been working at New Penn Financial for approximately 3 ½ years and his professional career had excelled where he was making around $10,000/per month.

19. Maria Keegan had worked at New Penn Financial for 5 ½ years and had a stable career at New Penn.

20. In July 2016, Richard Hernandez began talking to the management team at the Money Source about employment possibilities for himself and for Steve Hernandez and Maria Keegan, both of whom were currently on his team at New Penn.

21. On July 18, 2016, Richard Hernandez spoke with Mike Mirshazadeh, the Chief Revenue Officer of the Money Source, on behalf of himself and some of his team which included Maria Keegan and Steve Hernandez.

22. The false misrepresentations started during this conversation.

23. Mr. Mirshahzadeh told Mr. Hernandez that The Money Source had almost 3 billion of loans in New York State that fit a particular profile which was the following: they were all loans that had rates over 4%; were loan amounts that were all in excess of 250,000; and were held by current clients that either had a Federal Housing Administration (FHA) loan or a Department of Veteran Affairs (VA) loan.

24. Mr. Mirshahzadeh explained that Mr. Hernandez's team would only solicit and work on these 3 billion in loans that they had in the Money Source's profile and could be streamlined.  This was significant to the Plaintiffs because a streamline loan does not require a home appraisal or verification of the client's income, making the refinancing process considerably easier and faster to complete.

25. Mr. Hernandez was in New York during this conversation, while upon information and belief, Mr. Mirshahzadeh was in the Money Source's office in Arizona. Richard Hernandez spoke with Mr. Mirshazadeh over the phone and Maria Keegan was present with Richard Hernandez during the call.

26. Richard Hernandez relayed all the information that he had been told by Mike Mirshahzadeh to his team members, Steve Hernandez and Maria Keegan.

27. Based on the numbers and information conveyed by Mike Misrshazadeh, Richard Hernandez, Steve Hernandez and Maria Keegan thought that there was a great opportunity at the Money Source.

28. Upon the request from The Money Source, on July 19, 2016, Richard Hernandez had a meeting with Trent Ford and Jedd Lara at the Money Source's office in Melville, New York.  Again, Richard Hernandez spoke with Trent Ford and Jedd Lara on behalf of himself and his team members, Maria Keegan and Steve Hernandez.

4

29. Upon information and belief, Trent Ford was and still is the Executive Vice President of Portfolio Retention at the Money Source while Jedd Lara was and still is the National Sales Manager of the Money Source.

30. Both Mr. Lara and Mr. Ford also reiterated that there were about 3 billion worth of loans that the Money Source had in its portfolio that would be specifically for Richard Hernandez and his team.  Mr. Lara stated that these 3 billion worth of loans would be comprised of loans that were at least $ 250,000 and had an interest rate of over 4%.

31. This was extremely significant for the Plaintiffs because such a large pool of potential FHA and VA greatly increased the Plaintiffs' ability to earn more money.   The plaintiffs would not have to go searching for viable loans nor would they have to deal with a lengthy closing processes.

32. Again, these numbers were highly significant because the greater the loans available to refinance meant more sales and commissions for the Plaintiffs.

33. Mr. Lara and Mr. Ford both again reaffirmed that the New York group that Richard Hernandez would lead would only target New York customers that already existed in the Money Source's portfolio who qualified for either a FHA streamline loan or a VAIRLLL loan.

34. Trent Ford and Jedd Lara told Mr. Hernandez to discuss the details of the arrangement with his team.

35. On July 20, 2016, to verify what he had said, Mike Mirshazadeh sent Richard Hernandez and his team two spreadsheets to prove the overall loan production that was being originated from the retention division in the prior two months.

36. The spreadsheets were consistent with the numbers that Richard Hernandez had been discussing with Mr. Ford and Mr. Lara.

37. Although the Plaintiffs were reluctant to leave New Penn Financial since they all had stability and access to steady loans at New Penn, the Plaintiffs, relying on the representations that had been told to them, thought that the Money Source would be better financially.

38. Steve Hernandez and Maria Keegan left their employment at New Penn and began working at the Money Source on August 22, 2016 as retain loan officers.

39. Richard Hernandez left his employment at New Penn and began working at the Money Source on September 12, 2016 as a Retail Sales Manager.

40. Upon leaving New Penn and starting at The Money Source, the plaintiffs quickly learned, however, that the Money Source had made significant misrepresentations to them. The Money Source did not have almost 3 billion worth of loans for Richard Hernandez and his team that fit the profile that had been discussed. The Money Source had grossly inflated the amount of leads that they had in New York to persuade the Plaintiffs to come work for the Money Source.

41. In fact, by the end of September 2016, the Money Source had no leads.

42. Without a sizeable pool of loans to draw upon, there was little ability for the Plaintiffs to earn money, let alone the amount that they had been earning at New Penn.

43. The few loans that the Plaintiffs did receive were not the loans that the Money Source had told them were available within the Money Source's portfolio.

44. The loan amounts were less than $ 250,000 and were often with interest rates under 4%.

45. After a few weeks of working at the Money Source, Jedd Lara, Trent Ford and Darius Mirshazadeh stated that they did not have any loans available but that the Money Source would be buying a list of non-retention loans to provide to the Plaintiffs.

46. Non-retention loans are not able to be streamlined and require a lot more work and effort.

47. The Plaintiffs had only been enticed to work at the Money Source because they had been told that the Money Source had streamlined loans available to refinance.

48. Defendants knowingly made false representations of material facts to which the Plaintiffs relied on to their detriment.

49. Plaintiffs were injured by Defendants' fraudulent inducement of them to leave their positions with New Penn, in that they have not been able to secure similar employment at a compensation rate equivalent to that which they earned with New Penn.  To date, Plaintiffs have lost substantial compensation.

50. Defendants' conduct was malicious, willful, outrageous and conducted with full knowledge of the law.

51. After Plaintiffs started working for the Defendant, the Plaintiffs also learned that the Defendant was in violation of rules and regulations set forth by the Consumer Financial Protection Board.

52. From the onset of their employment, Richard Hernandez, Steve Hernandez and Maria Keegan all became aware that the Money Source was not in compliance with various federal regulations, most notably the TILA-RESPA Integrated Disclosure Rule § 1026.19(e)(1)(iii)(A).

53. The TILA-RESPA Integrated Disclosure Rule requires that clients receive the standard loan disclosures within 3 business days after their application is taken from a loan officer.

54. This Rule provides protection for consumers as it requires mortgage consumers to guarantee in writing the rates that are promised over the phone by loan officers.

55. Without receiving such written confirmations, consumers would be unable to shop for the most competitive mortgage rates and would be vulnerable to mortgage companies reneging on promised mortgage rates.

56. Once the complainants became aware that the Money Source was not in compliance with this Rule as well as some other regulations, Richard Hernandez, Steve Hernandez and Maria Keegan all became vocal and began objecting to the company's non-compliance.

57. Since Steve Hernandez and Maria Keegan were supervised by Richard Hernandez, Maria Keegan and Steve Hernandez voiced their complaints to Richard Hernandez who would then relay their complaints to management as well as his own complaints.

58. From the beginning of his employment to the last week of his employment, Richard Hernandez would continually raise the company's non-compliance regarding the 3rd day disclosure rule to Jedd Lara, the National Sales Manager. Richard Hernandez also raised the issue with Arturo Lepe, the Disclose and Setup Manager and Trent Ford, the Executive Vice President.

59. At least twice a week, Richard Hernandez would complain to Jedd Lara that he and his team members [Maria and Steve] were getting grievances from clients about the disclosures not being made within the 3-day mandatory period.  Mr. Lara would respond by saying that they were working to get caught up with the back log, but the issues were never resolved.

60. Since Mr. Hernandez brought it up so often, Mr. Lara often got annoyed and agitated by Mr. Hernandez's continually harping on the subject.

61. Mr. Hernandez would also sometimes email Mr. Lara about the noncompliance of various loans.  For example, on October 11, 2016, Richard Hernandez emailed Jedd Lara with a list of loans that were not disclosed within the proper time.

62. On October 24, 2016, Richard Hernandez wrote an email to Mr. Lepe raising the lack of compliance with disclosures on loans that was registered almost a month prior.

63. Recognizing the significance of the issue, Richard Hernandez even emailed Mr. Lara and Mr. Lepe on October 26, 2016 making suggestions and recommendations on how to rectify the compliance issues surrounding the disclosures.

64. Additionally, on October 27, 2016, Richard Hernandez emailed Arturo Lepe directly to discuss another violation that occurred on one of Richard's loans. The Money Source had changed the date on one of his loan applications so that the company would be in compliance with the disclosure rules. Knowing that changing the date on loan applications was another violation of the rules of the Bureau, Mr. Hernandez raised that issue immediately.

65. On October 28, 2016, Richard Hernandez wrote another email to Mr. Lepe again raising the issue that the three-day disclosure rule had not been followed on one of Ms. Keegan's loans.

66. On at least two occasions, Richard Hernandez also spoke with Trent Ford about the 3-day disclosure rule not being followed.

67. Although Richard Hernandez continually raised both Maria Keegan and Steve Hernandez' complaints regarding the Money Source's noncompliance with the three-day rule, both Ms. Keegan and Steve Hernandez also raised the issue various times themselves.

68. Maria Keegan emailed Lila Baik, Money Source's Production Manager, Jedd Lara, Arturo Lepe, and Natalie Abadir-Venette, the Executive Vice President of Production on separate occasions raising the issue of the company's non-compliance with the TILA-RESPA Integrated Disclosure Rule.

69. On September 26, 2016, Ms. Keegan sent Ms. Baik two emails wherein she notified Ms. Baik her concern that disclosures were not being sent out within the 3 days which was required.

70. Although Ms. Baik responded to Ms. Keegan by email stating that there have been "delays with the disclosures" she stated that they were working to remedy the situation.

71. Despite Ms. Baik's email, the delay continued and Ms. Keegan later emailed Mr. Lara her frustration regarding the company's noncompliance.  "I submitted the loan to easy on October 3rd…. this loan took over two weeks to be disclosed. Is this the way situations like this are handled?"

72. On October 24, 2016, Ms. Keegan complained again about the lack of compliance. She emailed Mr. Lara," I haven't heard back from Arturo and I understand he's [sic] extremely busy. My concern is that [sic] my borrower that has yet to be disclosed on is asking me why he hasn't received the disclosures and that it has been over the "disclosure period"

73. On October 25, Ms. Keegan, still having no response, emailed Mr. Lara, "I still have not heard from anyone in regards to this loan being disclosed. As mentioned this borrower has been patiently waiting and I am not sure why it still hasn't been disclosed. It was registered in EASY on 9/30."

74. On October 28, 2016, Ms. Keegan again raised the disclosure issue to Ms. Abadir-Venette. Ms. Keegan stated, "I have a loan that was registered on 10/3 and has yet to be disclosed. I am not sure if this one slipped through the cracks.

75. Ms. Keegan also raised concerns about the issue directly to Darius Mirshahzadeh, the CEO of the Money Source.

76. The first conversation she had with Mr. Mirshahzadeh was over the phone in mid-October 2016. Ms. Keegan told him that the disclosures for the loans were not being sent out in a timely manner which was a significant problem.

77. Approximately two weeks later, on or about October 28, 2016, Ms. Keegan ran into Mr. Mirshahzadeh in the office and again she reiterated her complaint that the Money Source was not in compliance with the disclosure regulations. Additionally, Ms. Keegan also objected to the Money Source's practice of changing the date on loan applications so that they would be in compliance with the disclosure regulations.

78. Ms. Keegan also spoke directly to Mr. Lara on at least five separate occasions voicing her complaint about the company's noncompliance with the three-day rule. At least one of those conversations was during her last week of employment at the Money Source.

79. Steve Hernandez emailed Shanna Schapp, Assistant Vice President of Portfolio Retention, and Arturo Lepe on October 6, 2016.  In Steve Hernandez's email he questioned why proper protocol was not followed in sending out disclosures. Mr. Hernandez stated "Good afternoon Shanna this loan was registered on 9/16 but I actually took the application in early September the borrower has yet to receive the disclosures and he calls every other day to get a status is there any way we can we plan put a rush on this one?"

80. On October 10, 2016, Mr. Steve Hernandez emailed Mr. Lara since he did not receive a response from his earlier email regarding the disclosures. He again grieved, "…this application was taken in early September and registered on 9/16 the borrower calls every other day to get a disclosure status and I have nothing to tell him…."

81. In addition to the emails, the complainants were vocal about their opposition to the company's noncompliance with the TILA-RESPA Integrated Disclosure Rule § 1026.19(e)(1)(iii)(A).

82. By the time that they were terminated on November 4, 2016, it was obvious that Money Source did not want to hear their incessant objections to the company's noncompliance any more.

83. Richard Hernandez, Steve Hernandez and Maria Keegan were all terminated on November 4, 2016.

84. The complainants were all terminated in retaliation for their objecting to and/or refusing to participate in the company's non-compliance with the TILA-RESPA Integrated Disclosure Rule § 1026.19(e)(1)(iii)(A).

85. Richard Hernandez, Steve Hernandez and Maria Keegan engaged in activity protected by 12 U.S.C § 5567 by objecting to the company noncompliance with the TILA-RESPA Integrated Disclosure Rule § 1026.19(e)(1)(iii)(A).

86. As a result of the Money Source's retaliatory firings, the complainants have suffered loss of compensation (including commissions) and benefits, mental anguish, loss of reputation, and loss of advancement opportunities.

**AS AND FOR A FIRST CAUSE OF ACTION**

**Fraudulent Inducement Against the Defendant**

87.   Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

88. As detailed above, in order to deceive Plaintiffs, Defendant knowingly misrepresented, the amount and type of loans that they had available for the Plaintiffs.   The false and misleading statements were made for the purpose of inducing Plaintiffs' to leave their employment with New Penn and to come work for The Money Source.

89. Plaintiffs, reasonably relying on these misrepresentations, were induced to leave their stable and profitable employment with New Penn and enter employment with Defendant. Plaintiff suffered damages proximately caused by Defendants fraudulent inducement.

90. As a direct and proximate result of Defendant's actions, Plaintiffs lost professional opportunities, damaged their professional reputation, had diminution of their earnings and earnings potential and damage to their career growth.  Plaintiffs have also had monetary damages, including attorneys' fees, and emotional distress.

### AS AND FOR A SECOND CAUSE OF ACTION

### Violation of 12 U.S.C §5567

91. Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

92.  Plaintiffs are covered employees within the definition of 12 U.S.C. §5567, in that they engaged in offering or providing consumer financial products or services within the meaning of 12 U.S.C. §5481(6), and/or service providers, within the meaning of 12 U.S.C §5567(b), in they provided material services to a covered person in connection with the offering or provision by the covered person of a consumer financial product or service within the meaning of 12 U.S.C. §5481(26).

93. As discussed above, Plaintiffs reasonably believed that the Defendant was engaging in a violation of a law, rule, or standard subject to the jurisdiction of, enforceable by the Bureau, within the meaning of 12 U.S.C. §5567.

94. Plaintiffs engaged in protected activity by objecting to this violation.

95.  Defendants have violated 12 U.S.C. §5567 because their decision to terminate Plaintiff's employment was based on Plaintiff's objection to, refusal to participate in, an "activity , policy practice or assigned task that [they] reasonably believed to be in violation of any law, rule, order, standard or prohibition , subject to the jurisdiction of, or enforceable by the Bureau." 12 U.S.C. §5567(a)(4).


## AS AND FOR A THIRD CAUSE OF ACTION

### Breach of Contract

96. Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

97. In Steve Hernandez and Maria Keegan's employment contracts with Defendant, it states, "Accordingly for any loan funded within 30 days after Employee's separation, Employee shall be paid according to the following schedule.

> 1) For any loan that is approved with the Closing Disclosure issued and acknowledged and loan documents signed and returned to Company prior to Employee's separation, Employee shall be entitled to 100% of the Commission as shown in their Agreement above.  In the event a loan is subsequently moved backwards in the origination process, including but not limited to redrawing of the loan documents, that specific loan shall subject to the apportionment designation in section 2 below;
>
> 2) For any loan that is in approved status without Closing Disclosure being issued and acknowledged or loan documents signed and returned to Company prior to Employee's separation, Employee shall split their

14

Commission, at the rate shown in their Agreement above, equally (50%
50%) with the MLO subsequently assigned to close the loan file;

3) For any loan that does not reach approved status prior to Employee's
separation, the loan shall be reassigned to a new MLO and Employee
hereby expressly waives any right a commission on that loan;

For any loan funded after 30 days from Employee's separation Employee's
here by expressly waives any right to a commission.

98. Upon information and belief, Plaintiff Steve Hernandez and Maria Keegan both had loans
that had been approved and closed within 30 days of their separation with the Company
for which they were not paid.

99. Plaintiff Richard Hernandez had the following provision in his employment contract
regarding commissions: "Manager Override:  Employee shall be entitled to a Manager's
Override on the total monthly closed loan volume of the retail sales team working under
the Employee's direct supervision, and assigned to them by their supervisor."

100. Upon information and belief, Defendant did not pay Richard Hernandez the manager
override commissions that he was entitled to receive.

101. Plaintiffs requested a breakdown of the loans that they had in the pipeline at the time of
their termination so they could calculate their owed commissions.

102. Defendants refused to provide such a breakdown.

103. Plaintiffs did not receive the commissions that they had expected to receive based on
what they had in their pipelines.

104. Defendant failed to the pay the commissions that were owed to them as per the terms that
were set forth in the Plaintiffs' employment contracts.

105. Plaintiffs suffered monetary damages as a result of Defendant's failure to pay their proper
commissions as outlined in their employment contracts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor and against Defendant, awarding the following relief:

(a) An award of damages in an amount to be determined at trial to compensate plaintiffs for all monetary and/or economic damages, including but not limited to, lost income and wages;

(b) An award of damages in an amount to be determined at trial to compensate plaintiffs for all non-monetary and/or compensatory damages, including but not limited to compensation for mental anguish, anxiety, stress, humiliation, embarrassment, and emotional distress;

(c) An award of punitive damages in recognition of the knowing, willful and wanton nature of Defendant's misconduct;

(d) An award of all costs that the plaintiffs have incurred in this action, including reasonable attorneys' fees;

(e) Such other relief as this Court may deem just and proper.

JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

Dated: New York, New York
       November 27, 2017

LAW OFFICES OF LAUREN GOLDBERG, PLLC

By:_____

LAUREN GOLDBERG (LG: 9890)
Attorney for Plaintiff
65 Broadway, 7th Floor
New York, N.Y. 10006
(646) 452-8380

16