**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
RICHARD HERNANDEZ, STEVE
HERNANDEZ, and MARIA KEEGAN,

                              Plaintiffs,

               -against-

THE MONEY SOURCE INC.,

                            Defendant.
----------------------------------------------------------------X

                                              **REPORT AND**
                                        **RECOMMENDATION**

                                  CV 17-6919 (GRB) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.    P̲R̲E̲L̲I̲M̲I̲N̲A̲R̲Y̲ ̲S̲T̲A̲T̲E̲M̲E̲N̲T̲

      Plaintiffs Richard Hernandez ("Richard"), Steve Hernandez ("Steve"), and Maria Keegan

("Keegan") (collectively, "Plaintiffs") commenced this action against Defendant The Money

Source Inc. ("Money Source") asserting claims for fraudulent inducement, retaliation in violation

of the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §5567 *et seq*., and breach of

contract arising from their employment with Money Source.  *See generally* Complaint

("Compl.") [DE 1].  Plaintiffs allege that Money Source misrepresented the amount of a specific

type of loan contained in their portfolio to induce Plaintiffs to accept employment with Money

Source.  *Id*.  Shortly after commencing employment with Money Source, Plaintiffs contend they

were terminated without having been fully compensated for commissions they were entitled to

under the terms of their employment agreements.  *Id*.

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."),

Defendant Money Source now moves for partial summary judgment on Plaintiff's fraudulent

inducement and and breach of contract claims.  *See generally* Defendant's Memorandum of Law

in Support of Motion for Summary Judgment ("Def.'s Mem.") [DE 53-29]; Defendant's Reply

Memorandum of Law in Further Support of Motion for Summary Judgment ("Defs.' Reply")

[DE 60].  Plaintiffs oppose the motion, primarily on the grounds that they have established all the

elements of fraudulent inducement and that the issue of reasonable reliance should be left to the

finder of fact.  *See* Plaintiffs' Memorandum of Law in Opposition to Motion for Summary

Judgment ("Pls.' Opp'n") [DE 54] at 16-20.  Judge Brown referred Defendant's motion for

summary judgment to this Court for a Report and Recommendation as to whether the motion

should be granted.  *See* May 15, 2020 Electronic Order.

      For the reasons which follow, this Court respectfully recommends to Judge Brown that

Defendant's motion for summary judgment be GRANTED, in part, and DENIED, in part.

## II.    BACKGROUND

### A.    Preliminary Issues

      In accordance with Rule 56.1 of the Local Rules of the United States District Courts for

the Southern and Eastern Districts of New York, Money Source submitted (1) a Statement of

Material Facts ("Def.'s SOMF") [DE 53-30]; (2) the Declaration of John H. Gionis, Esq.

("Gionis Decl.") [DE 53-1], counsel for Money Source, in Support of Defendant's Summary

Judgment Motion, with supporting exhibits; (3) the Affidavit of Rick Toma, Chief Operating

Officer of Money Source ("Toma Aff.") [DE 53-2]; and (4) the Affidavit of Maria Coh-Prospero,

Senior Vice-President of People and Culture of Money Source ("Coh-Prospero Aff.")

[DE 53-3].[1]   In opposing Money Source's motion, the Plaintiffs have submitted (1) a

---

[1]      The Court notes that the Toma and Coh-Prospero affidavits essentially mirror
Money Source's Rule 56.1 Statement and do not appear to add any evidentiary value to Money
Source's motion for summary judgment.  In fact, Money Source does not cite to these affidavits
at all in its Rule 56.1 Statement or in its memoranda submitted in support of its motion.

Counterstatement of Material Facts ("Pls.' COMF") [DE 59] which responds to Money Source's Rule 56.1(a) Statement and also sets forth additional material facts; (2) the Declaration of Lauren Goldberg, Esq. ("Goldberg Decl."), counsel for Money Source, with supporting exhibits; (3) the Declaration of Richard Hernandez ("Richard Decl.") [DE 56]; (3) the Declaration of Steve Hernandez ("Steve Decl.") [DE 57]; and (4) the Declaration of Maria Keegan ("Maria Decl.") [DE 58].

The Court points out that Rule 56.1 requires the nonmovant to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and, *if necessary*, additional paragraphs containing … *[a] statement of additional material facts* as to which it is contended that there *exists a genuine issue to be tried*." Rule 56.1(b) (emphasis added). The paragraphs asserting additional facts in Plaintiffs' Rule 56.1 Counterstatement do not appear to include facts for which there exists a genuine issue to be tried, nor do the additional facts serve to dispute the material facts asserted by Money Source. Rather, the paragraphs include alleged additional material facts which were not asserted by Money Source. *See Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene,* 746 F.3d 538, 544 (2d Cir. 2014) ("On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law."); *accord I.M. v United States*, 362 F. Supp. 3d 161, 190 (S.D.N.Y. 2019). Because Money Source failed to respond to these additional facts, they may be deemed admitted for purposes of the instant motion. *See* Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *Genova v. Cty. of Nassau*, No. 17-CV-4959, 2019 WL

8407451, at *1 (E.D.N.Y. Dec. 26, 2019), *report and recommendation adopted*, No. 17-CV-4959, 2020 WL 813160 (E.D.N.Y. Feb. 19, 2020) ("Because Plaintiff has failed to comply with Rule 56.1, the relevant facts, as set forth below, are deemed admitted by Plaintiff and are therefore taken solely from Defendants' Rule 56.1 Statement."); *Luizzi v. Pro Transport Inc.*, No. 02-CV-5388, 2009 WL 252076, at * 2 (E.D.N.Y. Feb. 2, 2009) ("Where the party opposing a motion for summary judgment fails to submit a proper counter-statement of material facts, controverting the moving party's statement, courts have deemed the moving party's statement of facts to be admitted and have granted summary judgment in favor of the moving party on the basis of the uncontroverted facts.").

However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F. 3d 62, 73 (2d. Cir. 2001). "Rather than rely on the parties' respective Local Rule 56.1 statements, a court 'may in its discretion opt to conduct an assiduous review of the record.'" *Chen v. Shanghai Cafe Deluxe, Inc.*, No. 17-CV-2536, 2019 WL 1447082, at *7 (S.D.N.Y. Mar. 8, 2019) (quoting *Holtz*., 258 F. 3d at 73); *see also Pensionsversicherungsanstalt v. Greenblatt*, 556 Fed. App'x 23, 25 (2d Cir. 2014) (summary order) (noting that "nothing requires a district court to deem evidence admitted, or grant summary judgment, simply because a non-movant fails to comply with local rules such as Local Rule 56.1"). Having conducted an independent review of the record, including (1) Money Source's Rule 56.1(a) Statements of Material Facts, (2) Plaintiffs' Rule 56.1(b) Counterstatement of Material Facts, (3) the declarations submitted in connection with the instant motion, and (4) exhibits attached to those affidavits, the Court turns to what it considers to be the undisputed facts or facts uncontroverted by admissible evidence. *See Truitt v. Salisbury Bank & Tr. Co.*, No. 18-CV-8386, 2020 WL 4208452, at *1 (S.D.N.Y.

July 21, 2020).  In doing so, the Court construes the facts in the light most favorable to the party opposing the respective motion.  *See Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *Capobianco v. New York*, 422 F.3d 47, 50 (2d Cir. 2001); *Coastal Pipeline Prod. of New York v. Gonzales*, No. 04-CV-8252, 2006 WL 473883, at *4 (S.D.N.Y. Feb. 28, 2006).

### B.    The Undisputed Material Facts

#### 1.    *Plaintiffs' Employment Prior to Money Source*

Prior to commencing their employment with Money Source, Plaintiffs were employed by New Penn Financial Corp. ("New Penn").  Compl. ¶ 16.  Richard worked at New Penn for approximately seven years as a senior sales manager and supervised 16 individuals.  *Id*. ¶ 17; Richard Decl. ¶ 5.  Steve and Maria worked as loan officers at New Penn for 3.5 and 5.5 years, respectively, and were among the individuals who reported to Richard.  Richard Decl. ¶ 5; Steve Decl. ¶ 3; Maria Decl. ¶ 3.

#### 2.    *Plaintiffs' Negotiations with Money Source*

In the summer of 2016, Richard began communicating with Money Source regarding employment opportunities at the company for himself, Steve, and Maria.  Def.'s SOMF ¶¶ 6-7.  Specifically, Richard had discussions with Mike Mirshahzadeh, the Chief Revenue Officer of Money Source, as well as Trent Ford, the Vice-President of Retail Lending of Money Source and Jedd Lara, the National Sales Manager of Money Source.  Pls.' COMF ¶¶ 37, 48.  While Richard participated in all of the meetings with Money Source, Maria and Steve participated only in some.  Def.'s SOMF ¶ 8.  Nonetheless, Richard attests that he advised Mirshahzadeh, Ford and Lara that he "would need to convey and discuss everything [he] learned from them to [his] team before deciding on whether [they] would join Money Source."  Richard Decl. ¶ 25.

Richard testified that in July 2016, he had a telephone conversation with Chief Revenue Officer Mirshahzadeh during which Mirshahzadeh stated that Money Source had approximately $3 billion dollars in either Federal Housing Administration ("FHA") or Veterans Administration ("VA") loans in their New York portfolio in amounts exceeding $250,000 and at interest rates in excess of 4%. Pls.' COMF ¶¶ 39-40. Although this statement was not directed to Maria, she attests to hearing Mirshahzadeh make the statement because she "was physically present with Richard" during the telephone conversation and "listened to [it] on speakerphone." Maria Decl. ¶ 4; Def.'s SOMF ¶ 10; Pls.' COMF ¶ 10. It is undisputed that Steve did not hear Mirshahzadeh's statement. However, he states that Richard would convey to him and Maria what was discussed during Richard's conversations with Money Source regarding the amount and types of loans in Money Source's portfolio. Steve Decl. ¶ 5.

During the July 2016 telephone conversation, Richard asked Mirshahzadeh to send him proof that Money Source had $3 billion dollars in loans. Pls. COMF ¶ 44. According to Richard, Mirshahzadeh responded that he could not do so but that he would send other documents to verify the loan portfolio. *Id*. ¶ 46. On July 20, 2016, Mr. Mirshahzadeh emailed Richard two charts which detail the amount and number of loans originated by Money Source in the two months prior. *Id*. ¶ 47. Although these charts did not demonstrate that Money Source had $3 billion dollars in loans in their New York portfolio, Richard maintains that they provided "some verification that Money Source was processing large volumes of loans in other states which had fewer loans than New York." Richard Decl. ¶ 18.

Also during the telephone conversation, Richard testified that Mirshahzadeh "made clear to [him] that [his] team would solicit and work solely on these [three] billion in loans that could be streamlined because they would not require income verification." Richard Decl. ¶ 12.

Richard maintains that "this was significant to [him] and [his] team because the loans would not require a home appraisal or verification of the client's income and could be refinanced much more quickly." *Id*. ¶ 13.  While Plaintiffs had these types of loans at New Penn, they did not have a significant amount of them.  Pls. COMF ¶ 43; Steve Decl. ¶ 6; Maria Decl. ¶ 6.  At New Penn, Plaintiffs had to search for viable loans and deals with lengthy closing processes.  Pls. COMF ¶ 44; Steve Decl. ¶ 6; Maria Decl. ¶ 6.

Mike Mirshahzadeh testified that he does not recall having any oral conversations with Richard regarding the amount of loans in Money Source's New York portfolio.  *See* Transcript of January 30, 2019 Deposition of Mike Mirshahzadeh ("Mirshahzadeh Tr."), annexed to Goldberg Decl. as Ex. 4 [DE 55-4] at 29:19-21.

After Richard spoke with Mirshahzadeh over the phone, he met with Trent Ford, the Vice-President of Retail Lending, and Jedd Lara, the National Sales Manager.  Pls.' COMF ¶ 48; Transcript of January 8, 2019 Deposition of Richard Hernandez ("Richard Tr."), annexed to Goldberg Decl. as Ex. 1 [DE 55-1] at 26:11-16.  Richard testified that both Jedd and Trent confirmed at this meeting that Money Source had approximately $3 billion dollars in either FHA or VA loans in their New York portfolio in amounts exceeding $250,000 and at interest rates in excess of 4%.  Pls.' COMF 53.  With respect to the amount of loans, Richard testified that Mr. Ford showed him a report which verified that Money Source's New York portfolio had approximately $3 billion dollars in loans.  Richard Decl. ¶ 22.

Trent Ford testified that he showed Richard a "stratification report" which summarized Money Source's aggregate loan portfolio at their meeting.[2]  *See* Transcript of February 8, 2019

---

[2]    Although he could not definitively recall whether it did, Ford testified that the stratification report likely did not include information regarding interest rates of the loans or whether they were FHA or VA qualified.  Ford Tr. at 44:8-23.

Deposition of Trent Ford ("Ford Tr."), annexed to Goldberg Decl. as Ex. 5 [DE 55-5] at 40:20-42:16.  Although Ford does not recall the exact amount of aggregate loans which was stated in the report for New York, he testified he was certain the number was "in excess of a billion."  *Id.* Whatever the number, Ford maintains that he "gave [Richard] the exact dollar amount that was on [the] stratification [report]."[3]  *Id.* at 45:21-25.  Ford also testified that he does not specifically recall whether he stated to Richard that the New York portfolio was comprised of FHA or VA loans.  However, he believed they most likely discussed the topic because "the only loans that were being originated out of portfolio retention for the Money Source were VA and FHA loans."  Ford Tr. 52:12-25.  Ford also does not recall what representations had been made regarding the portion of loans which had in excess of a 4% interest rate, but he did recall that "there were a lot of loans in New York that had interest rates over 4 percent."  Ford Tr. 55:19-25.

Jedd Lara testified that he "does not believe" he discussed the amount of loans in the New York portfolio with Richard at the meeting.  *See* Transcript of February 12, 2019 Deposition of Jedd Lara ("Lara Tr."), annexed to Goldberg Decl. as Ex. 6 [DE 55-6] at 31:7-25.  Lara also does not recall whether he stated to Richard that the loans in Money Source's New York portfolio had an interest rate in excess of 4% or if Richard asked him about the amount of loans in the portfolio.  *Id.* at 36:3-13.

On July 26, 2016, Mirshahzadeh emailed Richard regarding the terms of Plaintiffs' compensation at Money Source.  Def.'s' SOMF ¶ 11.  The email stated that "[t]here is 1.5 billion of untapped PR loans and that opportunity [is] priceless!"  Def.'s SOMF ¶ 11.  Richard did not

---

[3]      Defendant produced the stratification report to Plaintiffs after Trent Ford's deposition.  Richard Decl. ¶ 24.  However, Richard maintains that the produced report was not the same report he was shown during his meeting with Ford and Lara.  *Id.*  The report has not been submitted in support of the instant motion.

make any inquiry regarding the meaning of this statement or the purported discrepancy between the $3 billion and one and a half billion valuation of Money Source's loan portfolio. *Id.* ¶ 12. Richard attests that he did not interpret the July 26, 2016 email as an attempt to revisit the valuation of Money Source's loan portfolio because he had already thoroughly discussed the matter at several prior meetings with Mirshahzadeh, Ford and Lara during which it was represented that Money Source's had $3 billion dollars of loans in its New York portfolio. Richard Decl. ¶ 32.

### 3.    *Plaintiffs' Employment with Money Source*

Richard attests that after he discussed the stratification report and statements made by Money Source's representatives, including Mirshahzadeh, Ford and Lara with Steve and Maria, "[they] agreed that [] Money Source presented a great opportunity because of the amount and type of loans [in their portfolio] and … decided to join [] Money Source."  Richard Decl. ¶ 26. Both Steve and Maria attest that "[a]fter discussing the 3 billion in loans that the Money Source had represented that they had in their New York portfolio, as well as the types of loans that comprised the 3 billion, [they were] willing to leave [their] employment at New Penn to join Money Source."  Steve Decl. ¶ 7; Maria Decl. ¶ 7.  In August 2016, Steve and Maria commenced their employment with Money Source as retail loan officers.  Def.'s SOMF. ¶¶ 3-4.  Richard commenced his employment with Money Source as a retail sales manager in September 2016 and supervised three individuals, including Steve and Maria.  *Id*. ¶¶ 1-2; Richard. Decl. ¶ 4.

According to Plaintiffs, shortly after beginning their employment with Money Source, they discovered that Money Source did not have in their New York portfolio the amount or types of loans previously represented to them.  Pls.' COMF ¶ 50; Richard Decl. ¶ 9; Steve Decl. ¶ 9;

Maria Decl. ¶ 9.  While they were given some loans to pursue, Plaintiffs assert that these loans were less desirable because they were either below $250,000 and/or often had interest rates below 4%.  Pls.' COMF ¶ 63.  On November 4, 2016, Money Source terminated the employment of the Plaintiffs.  Compl. ¶ 82.

### 4.    *Plaintiffs' Employment Agreements with Money Source*

In connection with their hiring, Plaintiffs each executed the following agreements: (1) an offer of employment ("Offer of Employment"); (2) a confidentiality and non-solicitation agreement ("Confidentiality Agreement"); (3) a retail sales manager commission schedule ("Sales Manager Commission Schedule") or loan officer commission schedule ("Loan Officer Commissions Schedule"); and (4) a compensation agreement ("Compensation Agreement"). Def.'s SOMF ¶ 14, 17, 23-25, 36; Pls.' COMF ¶ 23.  Pursuant to the language of these employment agreements, it is undisputed that Plaintiffs were hired by Money Source as at-will employees.  Def.'s SOMF ¶ 14, 36.  The Offers of Employment set forth the terms of Plaintiffs' employment and provide in relevant part as follows:

> This letter forms the complete statement of employment between you and the Company.  These employment terms supersede any other agreements, understandings, promises, or communications, written or oral, by or on behalf of the Company. However, you should know that nothing contained in this offer of employment, our prior discussions regarding this offer and/or your acceptance hereof, or any of our policies, procedures and/or benefits creates a contract of employment with you or a guarantee of benefits or employment for a specific term.

Offer of Employment for Richard Hernandez, annexed to Gionis Decl. as Ex. G [DE 53-10] at 3; Offer of Employment for Steve Hernandez, annexed to Gionis Decl. as Ex. I [DE 53-12] at 3-4; Offer of Employment for Maria Keegan, annexed to Gionis Decl. as Ex. K [DE 53-14] at 3-4.

The Confidentiality Agreements govern the protection and confidentiality of Money Source's information or physical material, and provide, in relevant part, that:

> This [Confidentiality and Information Agreement] sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions between us.

Confidentiality Agreement for Richard Hernandez, annexed to Gionis Decl. as Ex. M [DE 53-16] ¶¶ 1, 10(b); Confidentiality Agreement for Steve Hernandez, annexed to Gionis Decl. as Ex. N [DE 53-17] ¶¶ 1, 10(b); Confidentiality Agreement for Maria Keegan, annexed to Gionis Decl. as Ex. O [DE 53-18] ¶¶ 1, 10(b).

The Sales Manager and Loan Officer Commission Schedules, as well as the Compensation Agreements, set forth in further detail Plaintiffs' compensation and other terms of employment. Pursuant to Richard's Sales Manager Commission Schedule, he was entitled to monthly base commissions, a base salary, and monthly manager override commissions. Sales Manager Commission Schedule, annexed to Gionis Decl. as Ex. G [DE 53-9] at 5-6. Relevant to the instant motion, Richard was entitled to a manager override commissions based on the total monthly volume of loans closed by the team working under his direct supervision and assigned to them by their supervisor. *Id.*; Def.'s SOMF ¶ 19. The manager override commissions were computed a rate of 3 basis points (0.0003 or 0.03%) for loans closed in the aggregate volume up to and including $10 million, 4 basis points (0.0004 or 0.04%) for closed loans in the aggregate volume greater than $10 million but up to and including $30 million, and 5 basis points (0.0005 or 0.05%) for closed loans in the aggregate volume greater than $30 million. *Id.*; Def.'s SOMF ¶ 20.

Pursuant to Steve and Maria's Loan Officer Commission Schedules, they were entitled to monthly base commissions at a rate of 40 basis points (0.0040 or 0.4%) per funded loan if 10 or fewer of their loans funded in the month, and 50 basis points (0.0050 or 0.5%) per funded loan if greater than 10 of their loans funded in the month. Def.'s SOMF ¶¶ 25-26; Loan Officer

Commission Schedule for Steve Hernandez, annexed to Gionis Decl. as Ex. H [DE 53-11] at 2;

Loan Officer Commission Schedule for Maria Keegan, annexed to Gionis Decl. as Ex. J

[DE 53-13] at 2. Both Steve and Maria were also entitled to an "Hourly Wage Recoverable

Draw" against their commission each month equal to $14.12 per hour worked. Def.'s SOMF

¶ 28; Loan Officer Commission Schedule for Steve Hernandez, Ex. H, ¶ 3; Loan Officer

Commission Schedule for Maria Keegan, Gionis Decl., Ex. J ¶ 3. Steve was entitled to draw

$4,000 per bi-weekly pay period ($8,000 per month) and Maria was entitled to draw $2,175 per

bi-weekly pay period ($4,350 per month). *Id*. The draws are recoverable as an offset against the

base commissions they earned in the same calendar month in which the hourly wages were

earned, regardless of whether the commissions were actually paid in the subsequent month. *See*

Loan Officer Commission Schedule for Steve Hernandez, Gionis Decl., Ex. H ¶ 3; Loan Officer

Commission Schedule for Maria Keegan, Gionis Decl., Ex. J ¶ 3.

According to the Compensation Agreements, in the event of termination, Plaintiffs were

entitled to half their base commissions for any loans funded within 30 days of their termination.

Compensation Agreement for Richard Hernandez, Gionis Decl., Ex. F at 3-5; Compensation

Agreement for Steve Hernandez, Gionis Decl., Ex. H at 3-5; Compensation Agreement for Maria

Keegan, Gionis Decl., Ex. J at 3-5. Plaintiffs' base commissions were to be split equally with the

mortgage loan originator ("MLO") subsequently assigned to close the loan file for any loan in

approved status without (1) the closing disclosure being issued and acknowledged, or (2) loan

documents having been signed and returned to Money Source prior to Plaintiffs' termination. *Id*.

Specifically, the Compensation Agreements provide, in relevant part:

> [C]ommissions shall not be deemed fully "earned" until such time as the loan
> is funded by [Money Source], and [the] Employee hereby expressly waives any
> right to a full commission for a loan this is subsequently funded after

Employee's date of separation.  Accordingly, for any loans funded within 30 days after Employee's separation, Employee shall be paid according to the following schedule.

1.  For any loan that is approved with the Closing Disclosure issued and acknowledged and loan documents signed and returned to Company prior to Employee's separation, Employee shall be entitled to 100% of the Commission as shown in their Agreement above. In the event a loan is subsequently moved backwards in the origination process, including but not limited to redrawing of the loan documents, that specific loan shall subject to the apportionment designated in section 2 below;

2.  For any loan that is in approved status without the Closing Disclosure being issued and acknowledged or loan documents signed and returned to Company prior to Employee's separation, Employee shall split their Commission, at the rate shown in their Agreement above, equally (50 %/50 %) with the MLO subsequently assigned to close the loan file;

3.  For any loan that does not reach approved status prior to Employee's separation, the loan shall be reassigned to a new MLO and Employee hereby expressly waives any right to a commission on that loan;

For any loan funded after 30 days from Employee's separation Employee's [*sic*] here by expressly waives any right to a commission.

Compensation Agreement for Richard Hernandez, Gionis Decl., Ex. F at 3; Compensation Agreement for Steve Hernandez, Gionis Decl., Ex. H at 4; Compensation Agreement for Maria Keegan, Gionis Decl., Ex. J at 4.

### C.   Procedural History

On November 28, 2017, Plaintiffs commenced the instant action against Defendant.  *See generally* Compl.  Plaintiffs assert claims for fraudulent inducement, retaliation in violation of the CFPA, and breach of contract.  *Id.*  In its Answer, Money Source asserts four affirmative defenses, including the failure to state a claim, failure to state non-pretextual grounds for termination, duplication of the fraudulent inducement and breach of contract claims, and failure

13

to demonstrate supplemental jurisdiction over the state law claims. *See* Answer [DE 10]. Discovery concluded on November 11, 2019. *See* DE 44. On December 9, 2019, Judge Feuerstein, who was then assigned to this case, set a briefing schedule for the parties' anticipated motions for summary judgment and referred the motions to this Court for a Report and Recommendation as to whether they should be granted. *See* DE 46. The case was reassigned to Judge Brown on February 10, 2020, who renewed the referral of the anticipated motions for summary judgment to this Court. *See* February 10, 2020 Electronic Order. Money Source filed a fully briefed partial summary judgment motion on June 17, 2020. *See* Def.'s Mem.; Def.'s Reply. Plaintiffs oppose the motion. *See* Pls.' Opp'n. Plaintiffs did not, however, move for summary judgment themselves.

## III.   STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 108 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party. *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005). In dispatching this task, a court need only consider admissible evidence. *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).

Where the movant shows a *prima facie* entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006); *Miller v. Nassau Health Care Corp.*, No. 09-CV-5128, 2012 WL 2847565, at *3 (E.D.N.Y. July 11, 2012). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin*, 467 F.3d at 273; *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor."). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Dobbs v. Dobbs*, No. 06-CV-6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims.") (internal quotation marks omitted).

## IV.  DISCUSSION

### A.    Fraudulent Inducement

Plaintiffs' fraudulent inducement claim (Count I) asserts that Money Source knowingly misrepresented the amount and type of loans available for Plaintiffs in their New York portfolio. *See* Compl. ¶¶ 87-90. Specifically, Plaintiffs allege that Money Source's representatives, including Chief Revenue Officer Mirshahzadeh, Vice-President of Retail Lending Ford, and National Sales Manager Lara misrepresented that Money Source had approximately $3 billion

dollars in either FHA or VA loans in their New York portfolio in amounts exceeding $250,000 and at interest rates in excess of 4%. *Id*. Based on these misrepresentations, Plaintiffs contend that they were induced to leave their employment at New Penn to join Money Source where they discovered that Money Source did not have the amount and type of loans represented. *Id*. As a result, Plaintiffs claim they suffered "lost professional opportunities, damage[] [to] their professional reputation, … diminution of their earnings and earnings potential and damage to their career growth." *Id*. Money Source moves for summary judgment on this claim arguing that Plaintiffs cannot, as a matter of law, sustain a cause of action for fraudulent inducement as at-will employees under New York law. *See* Def.'s Mem. at 13-15. Alternatively, Money Source contends that Plaintiffs cannot establish the requisite elements of a fraudulent inducement claim. *Id*. at 15-23.

### 1. *Whether Plaintiffs' Fraudulent Inducement Claim is Barred by their At-Will Employment Status*

Money Source maintains that Plaintiffs cannot sustain their fraudulent inducement claim as a matter of law because an at-will employee is barred from asserting such a claim under New York law. *See* Def.'s Mem. at 14; Def.'s Reply at 5-7. In opposition, Plaintiffs argue that the Second Circuit allows an at-will employee to assert a fraudulent inducement claim based on injuries resulting from the acceptance of employment – injuries which are separate and distinct from their termination. *See* Pls.' Opp'n at 14-16.

The Second Circuit has distinguished between fraud claims arising out of the *termination* of an employment-at-will situation and those arising out of the *acceptance* of such offer of employment. In *Stewart v. Jackson & Nash,* 976 F.2d 86, 88-89 (2d Cir.1992), the plaintiff was employed as an environmental law attorney when certain partners of the defendant law firm contacted her and represented that the defendant law firm had recently secured a large

environmental law client, was in the process of establishing an environmental law department, and plaintiff would head the environmental law department. *Stewart,* 976 F.2d at 87. Relying on those representations, the plaintiff joined the defendant law firm as an at-will employee. *Id*. After her arrival at the firm, the plaintiff learned that the defendants' representations were false and she found herself largely unable to practice environmental law. *Id*. at 87-88. The Second Circuit stated that "we find dispositive the New York Court of Appeals' distinction between a prospective business partner's 'promissory statement[s] as to what will be done in the future,' which give rise only to a breach of contract claim, and his or her false 'representation[s] of present fact,' which give rise to a separable claim of fraudulent inducement." *Id*. at 89 (quoting *Deerfield Commun. v. Chesebrough–Pond's,* 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003, 1004 (1986) (citations omitted)). The Court of Appeals upheld the plaintiff's fraudulent inducement claim because the damage to her career development which resulted from her reliance on defendant's representation was independent from her later termination. *Id*. at 88. In doing so, the Second Circuit noted that "[a]lthough [New York precedent] precludes an award of damages for injuries caused by her termination, it does not prevent her from recovering for injuries that resulted from her reliance on the defendants' false statements." *Id*.

Although the New York Court of Appeals has acknowledged the distinction made by the Second Circuit between claims arising out of the *termination* of an employment-at-will contract and the *acceptance* of such a contract, it has not taken a position on the validity of the distinction. *See Smalley v. Dreyfus Corp.*, 10 N.Y.3d 55, 59, 882 N.E.2d 882, 884 (2008) ("Without adopting or rejecting the Second Circuit's rationale, we note that *Stewart* is fundamentally different from the case now before us."). As Money Source points out, there is case law in New York which takes a position contrary to *Stewart*. *See* Def.'s Mem. at 14. These

cases have adopted the position that the "at-will employment doctrine … bars a cause of action sounding in fraudulent inducement, even where the circumstances pertain to a plaintiff's acceptance of an offer of a position rather than his or her termination." *Guido v. Orange Reg'l Med. Ctr.*, 102 A.D.3d 828, 829, 958 N.Y.S.2d 195 (2013); *see also O'Connor v. Harbrew Imports, Ltd*., 4 Misc. 3d 1016(A), 798 N.Y.S.2d 346 (Sup. Ct. 2004) ("As a rule, an at-will employee cannot claim damages for leaving his prior position because he cannot show reasonable reliance on a promise of continued employment with the new employer."); *Tannehill v. Paul Stuart, Inc*., 226 A.D.2d 117, 118, 640 N.Y.S.2d 505 (1996) ("Moreover, it cannot be said that plaintiff reasonably relied on defendant's representation, because the offered employment was at will.").  At first glance, this particular line of cases arguably bars an at-will employee from asserting a fraudulent inducement claim.  However, this does not appear to be the majority approach taken in New York.  *See Laduzinski v. Alvarez & Marsal Taxand LLC*, 132 A.D.3d 164, 167–68, 16 N.Y.S.3d 229, 231–32 (2015) (holding that "where an at-will employee alleges an injury *separate* and *distinct* from termination of the [his] employment, he may have a cause of action for fraudulent inducement") (internal citations omitted) (collecting cases); *Tronni v. Accessories Direct Int'l USA, Inc*., 61 Misc. 3d 1212(A), 110 N.Y.S.3d 894 (N.Y. Sup. Ct. 2018) (recognizing that "a cause of action for fraudulent inducement nonetheless can exist in an at-will employment situation"); *Navaretta v. Grp. Health Inc.*, 191 A.D.2d 953, 954, 595 N.Y.S.2d 839 (1993) (same).  Recognizing that "it is inconsistent with the majority of New York precedent, arguably inconsistent with the New York Court of Appeal's holding in *Smalley*, and unnecessarily extends the consequences of at-will employment beyond the justifications for that doctrine," courts in this Circuit have declined to adopt the position taken in the cases cited by Money Source.  *Hopkins v. Hopkins Envtl. Grp., Inc.*, No. 16-CV-841, 2017 WL 3217126, at *5

(W.D.N.Y. July 28, 2017); *see also Walia v. Veritas Healthcare Sols., L.L.C.*, No. 13-CV-6935, 2015 WL 4743542, at *8 (S.D.N.Y. Aug. 11, 2015) (applying *Stewart's* approach to fraudulent inducement claim after acknowledging that some New York state courts have barred an at-will employee from asserting a fraudulent inducement claim). Instead, courts in this Circuit have followed the Second Circuit's guidance in *Stewart* and recognized fraudulent inducement claims arising out of misrepresentations leading to the acceptance of an at-will employment contract where the injury alleged stems from leaving a former place of employment rather than from the termination of the subsequent employment. *See, e.g.*, *Hopkins*, 2017 WL 3217126, at *4; *Walia*, 2015 WL 4743542, at *8; *Lam v. Am. Exp. Co.,* 265 F. Supp. 2d 225, 231 (S.D.N.Y. 2003); *Hyman v. Int'l Bus. Machines Corp.*, No. 98-CV-12371, 2000 WL 1538161, at *3 (S.D.N.Y. Oct. 17, 2000) (collecting cases). This Court is similarly guided by *Stewart* and finds that a fraudulent inducement claim may be maintained as a matter of law in such circumstances.

Here, Plaintiffs assert that as a result of accepting employment with Money Source, they suffered "lost professional opportunities, damage [to] their professional reputation, … diminution of their earnings and earnings potential and damage to their career growth." *See* Compl. ¶ 90. As in *Stewart*, these alleged injuries arise from the acceptance of employment, not termination of employment.[4] Accordingly, the Court finds that Plaintiffs may maintain their fraudulent inducement claim as a matter law, notwithstanding their at-will employment status.

---

[4] Money Source argues unpersuasively that Plaintiffs cannot seek damages arising from both their acceptance of employment and Money Source's alleged breach of contract. *See* Def.'s Reply at 6. This argument misinterprets the breach of contract claim at-will employees are barred from asserting and that which is asserted here by Plaintiffs. At-will employees "can neither challenge their termination in a contract action nor 'bootstrap' themselves around this bar by alleging that the firing was in some way tortious" because they "may be freely terminated ... at any time for any reason or even for no reason." *Stewart*, 976 F.2d at 88 (citation omitted). Plaintiffs' breach of contract claim does not challenge their termination but rather seeks compensation under the terms of their employment agreements regardless of their termination.

### 2.    *Plaintiffs' Fraudulent Inducement Claim*

To establish a claim for fraudulent inducement under New York law, a plaintiff must prove "a material misrepresentation of fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiffs and damages." *Leighton v. Poltorak*, No. 17-CV-3120, 2018 WL 2338789, at *5 (S.D.N.Y. May 23, 2018) (citing *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 580 (2d Cir. 2005)); *see also PetEdge v. Garg*, 234 F. Supp. 3d 477, 490 (S.D.N.Y. 2017) ("To state a claim for fraudulent inducement under New York law, a plaintiff must prove '[i] a representation of fact, [ii] which is untrue and either known by defendant to be untrue or recklessly made, [iii] which is offered to deceive and to induce the other party to act upon it, [iv] and which causes injury.'") (quoting *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001)).  New York law requires each element of fraud to be established by "clear and convincing evidence," both for summary judgment and trial purposes.  *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd,* 354 Fed. App'x 496 (2d Cir. 2009).  New York law defines clear and convincing evidence to be a fact that is shown to be "highly probable." *Id.* (quoting 1A New York Pattern Jury Instructions—Civil § 1:64 (3d ed. 1999)).  This standard may be met with direct or circumstantial evidence.  *Id.* (citing *United States v. Letscher*, 83 F. Supp. 2d 367, 373 (S.D.N.Y.1999)).  When the moving party seeks summary judgment against fraud claims, the movant has "the burden of demonstrating *an absence* of clear and convincing evidence substantiating" the fraud claims.  *Id.* (emphasis added) (citing *Enzo Biochem, Inc. v. Johnson &*

---

Moreover, while Plaintiffs seek damages suffered as a result of their termination pursuant to their retaliation claim, these damages are distinguishable from those suffered as a result of Plaintiffs leaving their prior employment.

*Johnson*, No. 87-CV-6125, 1992 WL 309613, at *3 (S.D.N.Y. Oct. 15, 1992)); *Rojas v. Cigna Health & Life Ins. Co.*, No. 14-CV-6368, 2018 WL 4759775, at *7 (S.D.N.Y. Sept. 29, 2018). Therefore, summary judgment cannot be granted if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

The foregoing principle notwithstanding, courts should view summary judgment skeptically when assessing fraudulent inducement claims since those "issues typically turn on the parties' credibility as to their state of mind." *Century Pac.*, 528 F. Supp. 2d at 219*; see also Sound Video Unlimited, Inc. v. Video Shack Inc.,* 700 F. Supp. 127, 135 (S.D.N.Y. 1988) (determination of defendants' intentions "hinges upon the credibility of the various parties," and as a result, denying summary judgment on fraud claim); *ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse*, 609 F. Supp. 434, 449 (S.D.N.Y. 1984) ("[S]ummary judgment should be cautiously invoked in fraudulent inducement cases, which raise issues that often turn on credibility or inference, such as intent and reliance.").

### i.   Material Misrepresentations

To satisfy the first element of fraud in the inducement, a plaintiff must show that the defendant made a material false representation. *See Century Pac.*, 528 F. Supp. 2d at 220 (citation omitted). Assuming the alleged material misrepresentations were made, Money Source briefly asserts -- without any meaningful analysis or citation to supporting legal authority -- that Maria and Steve cannot demonstrate the first element of their fraudulent inducement claim because none of the alleged material misrepresentations were ever made directly to them. *See* Def.'s Mem. at 18; Def.'s Reply at 9. However, under New York law, "a claim for fraud may lie even when a plaintiff does not directly rely on a fraudulent representation made by the defendant,

if (1) the plaintiff received the information from someone who had received it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to [the plaintiff]." *Great W. Ins. Co. v. Graham*, No. 18-CV-6249, 2020 WL 3415026, at *25 (S.D.N.Y. June 22, 2020) (citing *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 348 (S.D.N.Y. 2010)).

Here, both Steve and Maria attest to having received the information regarding the alleged amount and types of loans Money Source had in its New York portfolio from Richard who had received the information from Money Source. Steve Decl. ¶ 7; Maria Decl. ¶ 7. There is also a strong inference that Money Source intended the representations to be conveyed to Steve and Maria in light of the fact that (1) Money Source was aware that Richard was discussing employment opportunities for himself as well as Steve and Maria, *see* Def.'s SOMF ¶ 6-7; and (2) Richard advised Money Source's representatives that he "would need to convey and discuss everything [he] learned from them to [his] team before deciding on whether [they] would join Money Source," *see* Richard Decl. ¶ 25. Therefore, drawing all reasonable inferences in Plaintiffs favor, the Court finds that a reasonable jury could conclude that Money Source indirectly made material misrepresentations of fact to Steve and Maria.

### ii.    Knowledge of Falsity

In order to prevail on the second element of a claim for fraudulent inducement, a plaintiff must show that the defendant had knowledge of the falsity of the representation at the time the representation was made. *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 450 (E.D.N.Y. 2013) (citing *Petrello v. White,* 344 Fed. App'x 651, 652 (2d Cir. 2009) (stating that a fraud in the inducement claim requires that the material misrepresentations be false and known to be false by the defendant)). Again, without any meaningful analysis or citation to legal

authority, Money Source asserts in passing that Plaintiffs cannot demonstrate this element because the record contains nothing but "self-serving testimony" regarding Money Source's knowledge concerning the falsity of the alleged oral representations.  *See* Def.'s Mem. at 19.  In opposition to the motion, Plaintiffs appear to have construed this argument as one related solely to the third element of their claim -- intent to defraud -- but they nonetheless address it.  In doing so, Plaintiffs point to more than just "self-serving testimony."

Relying on *Rojo v. Deutsche Bank*, No. 06-CV-13574, 2008 WL 4865037, at *7-8 (S.D.N.Y. Nov. 5, 2008), Plaintiffs argue that knowledge regarding the falsity of the representation may be inferred from the position of the corporate representative making the representation.  In *Rojo,* the plaintiff did not offer any specific evidence that the corporate representative who made the alleged misrepresentation knew that his representation was false or made the representative recklessly.  *Rojo*, 2008 WL 4865037, at *7-8.  Nevertheless, the court found "that a reasonable jury could find that [the corporate representative], a high-level executive at the Bank, clearly 'knew or should have known' that his representations regarding the manner in which the transaction would be treated on [d]efendant's books were false."  *Id*. at *7.  Similar to *Rojo*, a reasonable jury could find here that Money Source's Chief Revenue Officer, Vice-President of Retail Lending, and National Sales Manager -- based on their high-level positions -- seemingly knew or should have known that Money Source did not possess the amount and type of loans represented.  Money Source has not provided any legal authority to the contrary or nor has it pointed to any evidence from which the jury could draw a different inference.

Moreover, based on their personal knowledge gained through their employment with Money Source, Plaintiffs attest to the fact that Money Source did not possess any of the types of

loans it represented in its New York portfolio.  *See* Richard Decl. ¶ 9; Steve Decl. ¶ 9; Maria

Decl. ¶ 9.  The Court recognizes that the total amount of loans in its portfolio, regardless of type,

may be a matter of degree which could, under certain circumstances, lend itself to innocent error.

However, as argued by Plaintiffs, the fact that Money Source purportedly had none of the types

of loans represented in its New York portfolio supports an inference that Money Source knew or

should have known its representations as to the types of loans were false.  Taking into account

the entire evidentiary record and drawing all reasonable inferences in Plaintiffs' favor, the Court

finds that a reasonable jury could find that Money Source had knowledge of the falsity of the

representations made.

### iii.     Intent to Defraud

"Intent to defraud can be generally shown by evidence of guilty knowledge or willful

ignorance."  *Rojas v. Cigna Health & Life Ins. Co*., No. 14-CV-6368, 2018 WL 4759775, at *9

(S.D.N.Y. Sept. 29, 2018) (citing *M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 565

(E.D.N.Y. 2010)).  "Courts routinely allow parties to rely on circumstantial evidence and

legitimate inferences therefrom to meet this burden, as there is usually no direct evidence of

fraudulent intent."  *Id.* (citing *Century Pac.*, 528 F. Supp. 2d at 222–23 (collecting cases)).  For

example, the "strong inference of fraudulent intent" may be shown by evidence of the

defendant's "motive and opportunity to commit fraud" or "conscious misbehavior or

recklessness."  *Id.* (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)).

Money Source contends that its representations could not have been made with an intent

to defraud Plaintiffs because Mirshahzadeh subsequently emailed Richard on July 26, 2016 that

"[t]here is 1.5 billion of untapped PR loans and that opportunity [is] priceless!" and sent him

charts detailing the amount and number of loans originated by Money Source which did not

support the existence of $3 billion dollars in loans in their New York portfolio.  *See* Def.'s Mem. at 19; Def.'s Reply at 10.  In opposition, Plaintiffs point to the deposition testimony of Richard, Mirshahzadeh, and Ford to argue that the email has little probative value because the meaning of the email is unclear based on the record.  *See* Pl.'s Opp'n at 22-23.  With respect to charts, Plaintiffs concede that the charts did not demonstrate Money Source having $3 billion of loans in their New York portfolio.  However, Richard attests that the charts provided "some verification that Money Source was processing large volumes of loans in other states which had fewer loans than New York."  Richard Decl. ¶ 18.

Although the July 26, 2016 email and charts may have some probative value with respect to Money Source's intent to defraud Plaintiffs, the Court is unable to assess such probative value based on the record before it.  Money Source's July 26, 2016 email refers to "1.5 billion of untapped *PR loans*."  However, Money Source failed to provide any explanation as to what "PR loans" are.  The probative value of the email depends entirely on the meaning of "PR loans."  For instance, if "PR" means FHA or VA loans in amounts exceeding $250,000 at interest rates in excess of 4%, the email has seemingly little probative value.  The reason is that regardless of whether Money Source subsequently represented that it possessed $1.5 billion in these loans, Plaintiffs assert that Money Source in reality had none of these types of loans for them to work on.  *See* Richard Decl. ¶ 9; Steve Decl. ¶ 9; Maria Decl. ¶ 9.  As to the charts, based on Richard's declaration, it appears that the charts contained information regarding Money Source's loan portfolio for states other than New York.  If that is the case, these charts do not negate the alleged misrepresentation made about the amount of loans Money Source had in its New York portfolio.  They simply do not corroborate the alleged misrepresentation.  Nonetheless, as with the July 26, 2016 email, it is unclear specifically what information the charts contained

concerning the types of loans Money Source had in its portfolio.  Again, Plaintiffs allege that Money Source mispresented the amount of a specific type of loan, namely, FHA or VA loans in their New York portfolio in sums exceeding $250,000 at interest rates in excess of 4%.  Based on the record before the Court, it is unclear whether the July 26, 2016 email or charts speak generally to the total amount of loans Money Source possessed, regardless of type, or speak specifically to the total amount of FHA or VA loans in their New York portfolio in sums exceeding $250,000 at interest rates in excess of 4%.  This is an issue of material fact which has not yet been resolved with respect to Money Source's intent to defraud.

Moreover, as argued by Plaintiffs, there is evidence in the record with respect to Money Source's motive and opportunity from which Money Source's intent to defraud may be circumstantially inferred.  Regardless of who initiated the discussion, it is clear that Money Source was interested in recruiting Plaintiffs and engaged in discussions with Richard to achieve that end.  Def.'s SOMF ¶ 6-7; Pls.' COMF ¶¶ 37, 48.  Richard testified that during these discussion Mr. Mirshahzadeh stated that Money Source was actively looking to expand the group Plaintiffs were hired for.  Pls.' COMF 39; Richard Decl. ¶ 10; Richard Tr. 78-9.  Ford testified that he believed Richard was an "ideal fit" for Money Source based on the lack of experienced prospects for the position they were seeking to fill.  Ford Tr. 68:14-18, 69:1-14.  Money Source also had the opportunity to commit the fraud alleged since it was "well positioned to carry out the fraudulent transaction, because [it had], for example, the necessary trust and authority."  *TIC Park Ctr. 9, LLC v. Wojnar*, No. 16-CV-4302, 2017 WL 7733134, at *5 (E.D.N.Y. Apr. 7, 2017) (internal quotations omitted) (citing *Alnwick v. European Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 642 (E.D.N.Y. 2003)).  Further, although a distinct element of the claim, as discussed above, Money Source's "knowledge of the falsity of the[] representation is useful here as well,

and allows for a strong inference of the requisite fraudulent intent." *M&T Mortg. Corp.*, 736 F. Supp. 2d at 565.

Taking into account the entire evidentiary record to date, and drawing all inferences and viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that there are genuine issues of material fact from which a reasonable jury could find that Money Source had the intent to defraud Plaintiffs.

### iv.    Reasonable Reliance

The third element of fraud in the inducement is reasonable reliance. *See Century Pac.*, 528 F. Supp. 2d at 228.  "[Defendants] must demonstrate not only that they relied on the misstatements or misrepresentations, but that such reliance was both justifiable and reasonable." *Rojas*, 2018 WL 4759775, at *9 (citation omitted); *see also Century Pac.*, 528 F. Supp. 2d at 228 ("Under New York law, a plaintiff must establish that his reliance was justifiable, both in the sense that the party claiming to have been defrauded was justified in believing the representation and that he was justified in acting upon it.") (citation omitted).  In determining whether a plaintiff has met this standard, courts "consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Kwon v. Yun*, 606 F. Supp. 2d 344, 357 (S.D.N.Y. 2009) (citing *Emergent Capital Investment Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir. 2003)).

First, pointing to the testimony elicited at Plaintiffs' depositions, Money Source argues that Plaintiffs did not rely on the alleged misrepresentations because each Plaintiff testified that he/she would have accepted employment with Money Source even if it possessed a lesser amount of loans in its portfolio. *See* Def.'s Mem. at 19.  Defendants assert that in responding to

a line of questioning regarding the July 26, 2016 email, each Plaintiff specifically testified that he/she would have accepted employment with Money Source if it had $1.5 billion dollars rather than $3 billion dollars in loans in its New York portfolio.  Maria Tr. 47:22-49:20; Steve Tr. 289:8-14; Richard Tr. 281:5-10.  However, the Court points out that Defendants omit an important portion, for example, of Maria's answer to the question:

Q      So my question is, did Richard not share this reference to you before you
       decided whether you should take the job?

A      Yes, because when I read $1.5 billion of untapped PR loans that are
       priceless, to me, $1.5 billion is a job that I would still take, whether it was
       3 billion or 1.5 billion.

Q      So you're saying that the spread between the claimed representation
       of 3 billion and the written representation of 1billion –

A.     1.5 billion

Q.     – 1.5 billion was small enough where it would not have made a
       difference to you; is that what you just said?

                                    *     *     *

A.     I'm saying it wouldn't have made a huge difference. It still would have
       given us $1.5 billion of loans. And actually, every month adding more
       loans to your portfolio keeps adding on and on. So to me, looking at
       1.5 billion here – right, it says "untapped" PR loans -- when Mike also
       gave us the opportunity and the ability to say that, eventually, down
       the road we could also have access to other states. So this was just
       New York State, of 1.5 billion of untapped loans, it's New York State. . . .

Maria Tr. 47-48.

It is unclear from the Plaintiffs' testimony what types of loans Plaintiffs were referring to. Because the Court "must resolve all ambiguities and draw all reasonable inferences against the moving party," the Court assumes on a contextual basis that Plaintiffs were referring to FHA or VA loans in amounts exceeding $250,000 at interest rates in excess of 4%.  *See Linda Chun v.*

*Midland Funding, LLC*, No. 20-CV-0759, 2021 WL 216073, at *2 (E.D.N.Y. Jan. 21, 2021) (citing *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001)).  Based on this assumption, whether Plaintiffs would have accepted Money Source's offer of employment if Money Source possessed $1.5 billion dollars in either FHA or VA loans in amounts exceeding $250,000 at interest rates in excess of 4% rather $3 billion dollars is immaterial.  The issue here is whether Money Source actually possessed any of these types of loans for Plaintiffs to work on.  *See* Richard Decl. ¶ 9; Steve Decl. ¶ 9; Maria Decl. ¶ 9.

Assuming Plaintiffs relied on the alleged oral misrepresentation, Money Source contends that such reliance was unreasonable as a matter of law in light of the merger clauses contained in the Offers of Employment and Confidentiality Agreements.  *See* Def.'s Mem. at 15-17, 19.  In opposition, Plaintiffs maintain that the clauses at issue are general merger clauses which do not relate to a specific subject matter, and therefore do not demonstrate that Plaintiffs unreasonably relied on the alleged oral misrepresentation.  *See* Pls.' Opp'n at 16-19.

"It is well-established that where a contract contains a merger clause—a recitation that the written document reflects the entirety of the parties' agreement—'parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract.'"  *Kwon*, 606 F. Supp. 2d at 357-58 (quoting *Mfrs. Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 315 (2d Cir. 1993)); *see also Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, No. 19-CV-11730, 2020 WL 5211062, at *6 (S.D.N.Y. Sept. 1, 2020) ("Where a contract contains an express merger or integration clause, the parties have expressed an intent that the written contract constitutes the entirety of the parties' agreement, and parol evidence is likely to be barred.").  However, "a general merger clause is ineffective ... to preclude parol evidence that a party was induced to enter the contract by means of fraud."  *Id*. (citing *Mfrs. Hanover Trust Co.,* 7 F.3d at

315).  Generally, "an omnibus statement that the written instrument embodies the whole

agreement, or that no representations have been made," is insufficient to bar a claim of

fraudulent inducement.  *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 488 (S.D.N.Y. 2017); *see*

*also Mfrs. Hanover Trust Co.,* 7 F.3d at 315 (citing *Danann Realty Corp. v. Harris,* 5 N.Y.2d

317, 320, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959)).  The only exception to this rule is where

"a contract ... contain[s] explicit disclaimers of the specific representations that form the basis of

the claim for fraudulent inducement."  *Kwon*, 606 F. Supp. 2d at 357-58 (citations omitted); *see*

*also PetEdge*, 234 F. Supp. 3d at 488 ("When, however, the contract states that a contracting

party disclaims the existence of or reliance upon *specified* representations, that party will not be

allowed to claim that he was defrauded into entering the contract in reliance on those

representations.") (citation omitted); *Century Pac.*, 528 F. Supp. 2d at 229 (stating that a merger

clause bars an action for fraud under New York law where it "references a specific subject of

prior representations"); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc. (Emergent*

*Capital II* ), 195 F. Supp. 2d 551, 562 (S.D.N.Y. 2002), *vacated in part on other grounds*, 343

F.3d 189 (2d Cir. 2003) ("[W]here a party specifically disclaims reliance upon a particular

representation in a contract, that party cannot, in a subsequent action for common law fraud,

claim it was fraudulently induced to enter the contract by the very representation it has

disclaimed reliance upon.").  In order to bar a fraud claim, a merger clause must address "the

very matter as to which [the party] now claims it was defrauded."  *PetEdge*, 234 F. Supp. 3d at

488 (quoting *Icebox–Scoops v. Finanz St. Honore, B.V.*, 676 F. Supp. 2d 100, 112 (E.D.N.Y.

2009)).

Here, neither of the clauses Money Source points to are sufficiently specific to preclude

Plaintiffs' fraudulent inducement claim.  The Offers of Employment provide in relevant part that

"[t]his letter forms the complete statement of employment between you and the Company. These employment terms supersede any other agreements, understandings, promises, or communications, written or oral, by or on behalf of the Company." *See* Offer of Employment for Richard Hernandez, Gionis Decl., Ex. G at 3; Offer of Employment for Steve Hernandez, Gionis Decl., Ex. I at 3-4; Offer of Employment for Maria Keegan, Gionis Decl., Ex. K at 3-4. The Confidentiality Agreements provide, in relevant part: "This [Confidentiality and Information Agreement] sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions between us." *See* Confidentiality Agreement for Richard Hernandez, Gionis Decl., Ex. M ¶¶ 1, 10(b); Confidentiality Agreement for Steve Hernandez, Gionis Decl., Ex. N ¶¶ 1, 10(b); Confidentiality Agreement for Maria Keegan, Gionis Decl., Ex. O ¶¶ 1, 10(b). Neither of these clauses specifically disclaims reliance on any oral representations concerning the matters on which Plaintiffs now claim they were defrauded. Rather, these clauses are the type of general and vague merger clauses courts have found to be insufficient to warrant exclusion of parol evidence and preclude a fraudulent inducement claim.[5] *See CCM Rochester, Inc. v. Federated Inv'rs, Inc.*, No. 14-CV-3600, 2014 WL 6674480, at *4 (S.D.N.Y. Nov. 25, 2014) (clause providing that the

_____

[5]    A useful example of a sufficiently specific disclaimer can be found in the New York Court of Appeals' decision in *Danann*. There, the plaintiff sued for damages for fraud, alleging that it had been induced to enter into a sales contract by the sellers' false representations "as to the operating expenses of the building and as to the profits to be derived from the investment." *Danann*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d at 598. The contract between the parties stated that "[t]he Seller has not made ... any representations as to the ...*expenses* [or] *operation* ... [of] the aforesaid premises ... and the Purchaser hereby *expressly acknowledges that no such representations have been made*...." *Id.* (emphasis added). The court held that the plaintiff's fraud claim was barred by the express disclaimer of reliance on that specific representation. *Id.*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d at 599 ("[P]laintiff has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded.").

contract represents "entire agreement and all understandings, and supersede[s] all prior agreements and understandings, both written and oral, between the Parties with respect to the Transactions" was too general); *Kwon*, 606 F. Supp. 2d at 358 (clause providing the contract represented "parties 'entire understanding' and supersedes all non-written prior agreements, as well as a disclaimer of any party's reliance on any oral or written representations" was too general); *Emergent Capital Inv. Mgmt., LLC*, 195 F. Supp. 2d at 562 (clause providing that the contract "'contains the entire understanding and agreement between or among any of them, and supersedes all prior understandings or agreements between or among any of them with respect to the subject matter hereof'…would not by itself preclude reasonable reliance as a matter of law").

Finally, Money Source contends that Plaintiffs' reliance on the alleged oral misrepresentation was unreasonable in light of Money Source's subsequent statement in the July 26, 2016 email that "[t]here is 1.5 billion of untapped PR loans." *See* Def.'s Mem. at 19. Money Source contends that Richard should have exercised diligence in determining the meaning of this statement. *Id*. In support of this argument, Money Source correctly notes that "if the plaintiff has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was reasonably induced to rely on the defendant's alleged misrepresentations." *Century Pac.*, 528 F. Supp. 2d at 228. Even assuming this to be the case -- and that Richard did attempt to determine the meaning of Money Source's statement in its July 26, 2016 email – the question of what Richard would have discovered and whether such revelation would have disclosed whether the representations at issue were false are issues of fact that have not been addressed, let alone resolved, by Money Source in the instant summary judgment motion.

Taking into account the entire evidentiary record, and drawing all inferences and viewing the evidence in Plaintiffs' favor, the Court finds that there are genuine issues of material fact with regard to Plaintiffs' reasonable reliance on the alleged misrepresentations.[6]

For the foregoing reasons, the Court respectfully recommends to Judge Brown that Money Source's motion for summary judgment be DENIED as to Plaintiffs' fraudulent inducement claim.

### B.    Breach of Contract

Plaintiffs' breach of contract claim (Count III) asserts that Money Source failed to pay Plaintiffs commissions they were entitled to under the terms of their employment agreements. *See* Compl. ¶¶ 96-105.  Specifically, Plaintiffs claim that Richard was not paid manager override commissions and Steve and Maria were not paid base commissions on loans funded within 30 days after their termination on November 4, 2016. *Id*.  ¶¶ 96-100.  Money Source moves for summary judgment on this claim, arguing that any commissions owed to Plaintiffs for loans funded within 30 days after their termination must be set-off by overpayments of commissions made to them.  *See* Def.'s Mem. at 23-27; Def.'s Reply at 13-14.  In opposition to the motion, Plaintiffs contend that Money Source should be precluded from asserting a defense of set-off for the first time in its summary judgment motion.  *See* Pls.' Opp'n at 26-29.  Even assuming Money Source is permitted to assert a set-off defense, Plaintiffs argue that the evidence submitted by Money Source does not adequately demonstrate that the Plaintiffs were overpaid commissions. *Id*.

---

[6]    The Court need not address the remaining elements of Plaintiffs' fraudulent inducement claim since they were not meaningfully addressed by Money Source in its summary judgment motion.

The Court will first address whether Money Source waived its newly asserted defense of set-off.

### 1.    *Whether Money Source Waived its Defense of Set-Off*

Plaintiffs contend that Money Source waived any right to a defense of set-off because it did not plead set-off as an affirmative defense in its Answer to the Complaint.  *See* Pls.' Opp'n at 26-29.  Unaware of Money Source's intention to assert a defense of set-off, Plaintiffs argue that they did not request discovery relevant to the defense and would therefore be prejudiced if Money Source is permitted to assert the defense now.  *Id*.  While Money Source does not dispute that it failed to plead a defense of set-off in its Answer, it argues -- without citing to any supporting legal authority -- that a claim for set-off is not an affirmative defense required to be pleaded pursuant to Rule 8(c).  *See* Def.'s Reply at 13-14.  Alternatively, Money Source maintains that it should nonetheless be permitted to raise the defense because doing so would not result in any prejudice to Plaintiffs.  *Id*.

Rule 8(c) of the Federal Rules of Civil Procedure requires a party to affirmatively plead certain enumerated defenses, as well as "any avoidance or affirmative defense."  Fed. R. Civ. P. 8(c).  The Second Circuit has held that "irrespective of whether a setoff claim is properly characterized as an affirmative defense, *see* Fed. R. Civ. P. 8(c), or a compulsory or permissive counterclaim, *see* Fed. R. Civ. P. 13, it must be set forth in the pleadings to provide a basis for relief."  *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 42 (2d Cir. 2009).  A claim for set-off was not specifically asserted as an affirmative defense or a counterclaim in Money Source's Answer to the Complaint.  *See* Answer at 11-12.  Generally, the "[f]ailure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case."  *E.g.*, *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 176 (2d Cir. 2014) (citing

*Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir. 1984)); *Hunt v. Con Edison Co. N.Y.C.*, No. 16-CV-0677, 2018 WL 3093970, at *4 (E.D.N.Y. June 22, 2018) (citation omitted).  Nevertheless, if a party asserts an affirmative defense for the first time in a summary judgment motion, a "district court may, in its discretion, construe a motion for summary judgment as a motion … for leave to amend the defendant's answer." *Trustees of the United Plant & Prod. Workers Local 175 Benefits Fund v. Am. Paving & Masonry Corp.*, No. 15-CV-1223, 2016 WL 4991551, at *4 (E.D.N.Y. July 12, 2016), *report and recommendation adopted sub nom. Trustees of the United Plant v. Am. Paving & Masonry Corp.*, No. 15-CV-1223, 2016 WL 4991542 (E.D.N.Y. Sept. 15, 2016) (quoting *Anthony v. City of N.Y.*, 339 F.3d 129, 138 n. 5 (2d Cir. 2003)); *see also Balk v. New York Inst. of Tech.*, No. 11-CV-0509, 2013 WL 6990767, at *11 (E.D.N.Y. Sept. 30, 2013) ("If a party asserts an affirmative defense for the first time in a summary judgment motion, the court may construe the summary judgment motion as a motion to amend its pleadings, which shall be freely given when justice so requires.") (citation omitted).  In deciding whether to exercise such discretion, a court considers "the presence or absence of such factors as undue delay, bad faith, undue prejudice to opposing party, or futility of amendment." *Am. Paving & Masonry Corp.*, 2016 WL 4991551, at *4 (citation omitted); *see also Reives v. Lumpkin*, 632 Fed. App'x 34, 35 (2d Cir. 2016) (summary order) ("A district court may nevertheless entertain unpled affirmative defense in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings."); *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 276 (E.D.N.Y. 2019), *aff'd*, 815 Fed. App'x 612 (2d Cir. 2020) ("[E]ven where an affirmative defense is not adequately pleaded, a district court may still entertain it at the summary judgment stage 'in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the

proceedings.'") (citations omitted). "In particular, affirmative defenses raised for the first time in a summary judgment motion have been allowed where the plaintiff had a sufficient opportunity to respond." *Balk*, 2013 WL 6990767, at *11 (citation omitted).

In its discretion, the Court construes Money Source's claim for set-off in its summary judgment motion as a motion to amend the pleadings to add this affirmative defense to its Answer. *See Am. Paving & Masonry Corp.*, 2016 WL 4991551, at *4 (construing defendant's assertion of fraud in the execution in its opposition to summary judgment as a motion to amend their answer); *Ebert v. Holiday Inn*, No. 11-CV-4102, 2014 WL 349640, at *9 (S.D.N.Y. Jan. 31, 2014), *aff'd*, 628 Fed. App'x 21 (2d Cir. 2015) (construing defendants' opposition to summary judgment as a request to amend their answer to plead their proposed affirmative defense and analyzing the defense); *Del Turco v. Speedwell Design*, 623 F. Supp. 2d 319, 335 (E.D.N.Y. 2009) ("Nevertheless, the court considers defendants' assertion of this defense in their motion for summary judgment a constructive amendment to their Answer.").  In doing so, the Court points out that Plaintiffs do not contend that any bad faith, dilatory motive, or futility exists to support a denial of the amendment.  Plaintiffs also do not argue that the amendment itself will cause undue prejudice.  *See* Pls.' Opp'n at 25-29.  Indeed, Plaintiffs do not argue that the amendment will cause them to expend significant additional resources to conduct discovery and prepare for trial, significantly delay the resolution of the dispute, or prevent Plaintiffs from bringing a timely action in another jurisdiction. *See Nat'l Credit Union Admin. Bd. v. HSBC Bank US, Nat'l Ass'n*, 331 F.R.D. 63, 70 (S.D.N.Y. 2019) ("In determining what constitutes prejudice, courts generally consider whether the assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a

timely action in another jurisdiction.") (internal quotations omitted) (citing *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000)); *accord Benavidez v. Burger Bros. Rest. Grp., Inc.*, No. 17-CV-200, 2019 WL 1459044, at *9 (E.D.N.Y. Mar. 29, 2019) (citations omitted).

Rather, Plaintiffs' sole contention is that that they will be prejudiced if the merits of the amendment are addressed in the instant motion because they were unable to request discovery relevant to the amended defense. *See* Pls.' Opp'n at 25-27. As the defense of set-off specifically applies to Steve and Maria, Plaintiffs argue that they cannot adequately respond to the defense because they do not possess the closing disclosures on the loans for which Steve and Maria are alleged to have received an overpayment of base commissions on. *Id*. at 26-27. This argument, however, misinterprets Money Source's defense and the applicable terms of the Compensation Agreements implicated by the defense.

As discussed more fully below, Money Source argues that Steve and Maria received their full base commissions set forth in the terms of the Loan Officer Commission Schedules for certain loans funded within 30 days after their termination. *See* Def.'s Mem. at 23-25. According to Money Source, pursuant to the Compensation Agreements, Steve and Maria were only entitled to half their base commissions on these loans. *Id*. Specifically, the Compensation Agreements provide that Steve and Maria's base commissions were to be split equally with the mortgage loan originator subsequently assigned to close the loan file "[f]or any loan in approved status *without* the [c]losing [d]isclosure being issued and acknowledged *or* loan documents signed and returned to [Money Source] prior to [Steve or Maria's] termination." Compensation Agreement for Steve Hernandez, Gionis Decl., Ex. H at 2 (emphasis added); Compensation Agreement for Maria Keegan, Gionis Decl., Ex. J at 2 (emphasis added). Relying on documents produced during discovery and discussed in further detail below, Money Source maintains that

Steve and Maria were only entitled to half their base commissions on the loans at issue because the loan documents were not signed and returned to Money Source prior to Steve and Maria's termination -- not because the closing disclosures were not issued or acknowledged. *See* Def.'s Reply at 9-10. Consequently, the closing disclosures are not material to Money Source's defense of set-off.

As the defense of set-off specifically applies to Richard, although Money Source concedes that Richard is entitled to manager override commissions in the amount of $1,815.26, it argues that this amount should be set-off by manager override commissions Richard received in October 2016, in the total amount of $1,458.49. *See* Def.'s Mem. at 25-27. In support of this argument, Money Source relies on a commission spreadsheet produced during discovery which summarizes the manager override commissions Richard received in October 2016. *See* Commission Spreadsheet for Richard Hernandez, Gionis Decl., Ex. Y at 2. Among the manager override commissions received, the commission spreadsheet reflects 12 commissions which were not derived from loans that were generated by either Maria or Steve. *Id.* Pursuant to the Sales Manager Commission Schedule, Money Source contends that Richard was overpaid these 12 commissions because he is only entitled to manager override commissions on loans closed by loan officers "working under [his] direct supervision." Def.'s Mem. at 25-27. Plaintiffs claim that they cannot adequately respond to this defense because they do not possess "commission breakdowns for all loan officers on Richard's team as well as for those not on his team." Pls.' Opp'n at 26. However, Plaintiffs fail to explain why these "commission breakdowns" are necessary to respond to Money Source's defense.[7] *Id.* The "commission breakdowns," which

---

[7] Plaintiffs argue that the "commission breakdowns" are necessary to "verify" Money Source's accounting. *See* Pls.' Opp'n at 26-27. To the extent Plaintiffs are concerned about Money Source's accounting of the manager override commissions Richard was entitled to,

Money Source refers to as the "loan pipelines," would demonstrate the manager override commissions to which Richard was entitled.  Here, among the manager override commissions Richard received, the question is which ones was he not entitled to.  Plaintiffs have not adequately demonstrated that they lack information or documents material to this question.

Because Plaintiffs have had an adequate opportunity to respond to Money Source's set-off defense, have received the evidence relied upon by Money Source in support of the defense during discovery, and have not demonstrated any undue prejudice which would result from either allowing the amendment or addressing the merits of the amendment in the instant motion, the Court respectfully recommends that, in the interest of justice, Money Source's motion to amend the pleadings to add an affirmative defense of set-off be granted and the merits of the defense be considered.  *See Ebert*, 2014 WL 349640, at *9 (allowing defendants to amend their answer to raise an affirmative defense in opposition to a motion for summary judgment where "Plaintiffs had an adequate opportunity to address the defense in their reply papers and have not otherwise been prejudiced by the late pleading."); *Marathon Enterprises, Inc. v. Schroter GMBH & Co.*, No. 01-CV-0595, 2003 WL 355238, at *5 (S.D.N.Y. Feb. 18, 2003) (granting defendants leave to amend their answer to add an affirmative defense where "[plaintiff] has not been prejudiced, as [plaintiff] was not deprived of discovery on the issue and has had an opportunity to be heard in this respect"); *Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02-CV-4635, 2006 WL 1519981, at *11 (S.D.N.Y. June 1, 2006) (entertaining affirmative defense at summary judgment stage where "Plaintiffs do not argue that they would be unduly prejudiced by Snapple's assertion

---

the Court notes that the management override commissions Richard is owed is material to Plaintiffs' breach of contract claim.  Plaintiffs had the opportunity to conduct discovery relevant to this claim and do not explain how Money Source's failure to initially plead its defense of set-off prevented them from doing so.

of a Statute of Frauds defense, and there is no indication that such an allowance would require Plaintiffs to expend significant additional resources to conduct discovery and prepare for trial, significantly delay the resolution of the dispute, or prevent Plaintiffs from bringing a timely action in another jurisdiction").  Based on this conclusion, the Court turns to Money Source's set-off defense itself.

### 2.    *Money Source's Defense of Set-Off*

Having determined that Money Source may assert a defense of set-off, the Court now turns to the merits of such defense as it applies to each Plaintiff.  Money Source contends that for several loans funded within 30 days after Steve and Maria's termination, their base commissions were improperly computed at rates set forth in the Loan Officer Commission Schedules, rather than the reduced rates set forth in their Compensation Agreements, which resulted in an overpayment of commissions.  *See* Def.'s Mem. at 23-25.  After reducing these overpayments from any commissions owed, Money Source maintains that Steve and Maria are not owed any base commissions and therefore cannot sustain a breach of contract claim.  *Id*.  With respect to Richard, Money Source contends that in October 2016 he improperly received manager override commissions on loans which were generated by loan officers who were not under his direct supervision.  *Id*. at 25-27.  After deducting these overpayments from commissions owed to Richard, Money Source concedes that Richard is entitled to manager override commissions in the amount of $651.91, which it "stands ready, willing, and able to pay."  *Id*. at 26.

In support of its defense, Money Source submitted for each Plaintiff:  (1) earning statements for the months of October and/or November 2016; (2) a "loan pipeline" which summarizes the loans Plaintiffs were presumably working on at the time of their termination; (3) a "KISS Loan Summary" which provides loan specific information for loans listed on the "loan

pipeline" and funded within 30 days after Plaintiffs' termination; and (4) commission spreadsheets which summarize the commissions earned on those funded loans.  The Court will address Money Source's defense of set-off and the documents relied upon to support the defense as it applies to each Plaintiff in turn.

### i.    Steve Hernandez

Money Source concedes that Steve is owed a total of $2,713.36[8] in base commissions earned in November 2016, but argues that this amount must be set-off by an overpayment of base commissions on five loans which funded in that same month, in the total amount of $3,422.69.  *See* Def.'s Mem. at 23-24.  Steve's commission spreadsheet reflects five loans for which he received base commissions, in the total amount of $6,845.36, at the rate set forth in the

---

[8]    This amount consists of: (1) a draw in the amount of $2,000 which Money Source concedes was improperly deducted from Steve's November 2016 base commissions; and (2) a base commission in the amount of $713.36 for loan number 3061138 which Steve did not receive (and is not reflected on the commission spreadsheet).  *See* Def.'s Mem. at 24.

Steve's earning statement for the pay period between November 13 and November 26, 2016 indicates that he received a payment for a draw in the amount of $2,000.00.  *See* Earning Statements for Steve Hernandez, Gionis Decl., Ex. P [DE 53-19] at 2.  Steve's commission spreadsheet reflects that he earned base commissions in the total amount of $13,739.38 for loans funded within 30 days after his termination, excluding any alleged set-off.  *See* Commission Spreadsheet for Steve Hernandez, Gionis Decl., Ex. W at 2.  Steve's earning statement for the pay period between November 1 and November 30, 2016 indicates that he received a payment for commissions in the total amount of $9,739.35, which reflects the base commissions earned in November 2016 ($13,739.38) reduced by a draw ($4,000.00) taken that same month.  *See* Earning Statements for Steve Hernandez, Gionis Decl., Ex. P at 3.

Plaintiffs implicitly dispute that Steve received the payment reflected in his earning statement for the November 1 to November 16, 2016 pay period in the amount of $2,000 for a draw taken that month.  *See* Pls.' Opp'n at 25-26; Steve Decl. ¶¶ 13-15.  As such, Plaintiffs appear to take the position that Steve is owed an additional $2,000 (making a total of $4,000) which was improperly deducted as a draw from his November 2016 base commissions.  For the reasons discussed in Section IV.B.2.ii, Plaintiffs have not sufficiently demonstrated a genuine issue of fact as to the payments reflected in the earning statements submitted by Money Source.

Loan Officer Commission Schedules.[9]  *See* Commission Spreadsheet for Steve Hernandez, Gionis Decl., Ex. W [DE 53-26] at 2.  Pointing to the KISS Loan Summary for each of these five loans, Money Source maintains that these loans were funded after Steve's termination on November 4, 2016 – and consequently, he was only entitled to half his base commissions for these loans under the Compensation Agreement.  *See* Def.'s Mem. at 23-24.

Each KISS Loan Summary for the five loans in dispute demonstrates that the loans were indeed funded within 30 days after Steve's termination.  *See* KISS Loan Summaries for Steve Hernandez, Gionis Decl., Ex. R at 3-5, 9, 11.  However, this fact alone does not demonstrate that Steve should have received half his base commissions for these loans.  For loans funded within 30 days after Steve's termination, the Compensation Agreement provides that Steve "shall split [his] Commission … with the [mortgage license officer] subsequently assigned to close the loan file" for "any loan that is in approved status without the Closing Disclosure being issued and acknowledged or loan documents signed and returned to [Money Source] prior to … separation." Loan Officer Compensation Agreement for Steve Hernandez, Gionis Decl., Ex. H at 4.  If, however, a loan "is approved with the Closing Disclosure being issued and acknowledged and loan documents signed and returned to [Money Source] prior to … separation," Steve is entitled to the entirety of his base commissions set forth under the Loan Officer Commission Schedules. *Id*.

As such, in addition to demonstrating that the loan funded within 30 days after Steve's termination for each loan at issue, Money Source must also demonstrate that prior to Steve's

---

[9]      These five loans include loan numbers 3057257, 3057259, 3057308, 3058610, and 3058887.  *See* Commission Spreadsheet for Steve Hernandez, Gionis Decl., Ex. W.  Because Steve closed greater than 10 loans in November 2016, his base commissions were computed at a rate of 50 basis points under the Loan Officer Commission Schedule.  *Id*.; *see also* Loan Officer Commission Schedule for Steve Hernandez, Gionis Decl., Ex. H at 2.

termination *either* (1) the closing disclosure was not issued and acknowledged, *or* (2) the loan documents were not signed and returned to Money Source.[10]  In an attempt to prove the latter after Plaintiffs first raised the issue,[11] Money Source contends that the "DOCS BACK" date listed on the KISS Loan Summary represents the date the loan documents were "signed and returned to" Money Source.  Def.'s Reply at 14.  This contention, however, was made in passing by Money Source's counsel in the Reply memorandum and is not supported by the record.

The initial burden of establishing that no genuine factual dispute exists rests upon the party seeking summary judgment.  *Sys. Agency v. Villanueva*, No. 19-CV-6486, 2020 WL 7629879, at *1 (S.D.N.Y. Dec. 22, 2020) (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994)).  To carry that burden, Money Source must "cit[e] to particular parts of materials in the record, including depositions, documents, ... affidavits or declarations, ... or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Significantly, "[t]he evidence considered on summary

---

[10]    Plaintiffs implicitly argue that Money Source may additionally have to demonstrate that a mortgage license officer was subsequently assigned to the loan.  *See* Pls.' Opp'n at 28.  This prospect is unlikely since the Compensation Agreements provide that "commissions shall not be deemed fully 'earned' until such time as the loan is funded by [Money Source], and [the] Employee hereby expressly waives any right to a full commission for a loan this is subsequently funded after Employee's date of separation."  Loan Officer Compensation Agreement for Steve Hernandez, Gionis Decl., Ex. H at 4.  Therefore, it appears Plaintiffs waived any entitlement to full commissions on loans funded after their termination, regardless of whether a mortgage license officer was subsequently assigned to the loan.  Nonetheless, the Court need not resolve this issue because Money Source did not adequately demonstrate that the closing disclosures for the loans at issue were not issued and acknowledged **or** that the loan documents were not signed and returned to Money Source prior to Steve's termination.

[11]    Plaintiffs argue without success that the operative date is the "DOCS OUT" date listed on the KISS Loan Summary which, according to Plaintiffs, represents three days after the loan documents were *signed and acknowledged* by the borrower.  Pls.' Opp'n at 27-28 (emphasis added).  Pursuant to the Compensation Agreement, Steve is only entitled to full base commissions when, among other things, the loan documents are *signed and returned* to Money Source.  *See* Loan Officer Compensation Agreement for Steve Hernandez, Gionis Decl., Ex. H at 4.

judgment must generally be admissible evidence." *Sys. Agency*, 2020 WL 7629879, at *1

(*LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 205 (2d Cir. 2005)).

Although counsel provides a plausible interpretation of the meaning of "DOCS BACK," his

interpretation of terms on Money Source's business records carries little weight on a motion for

summary judgment. *See Dejana Indus., Inc. v. Vill. of Manorhaven*, No. 12-CV-5140, 2015 WL

1275474, at *2 (E.D.N.Y. Mar. 18, 2015) (rejecting counsel's affirmation on summary judgment

since it "could not possibly be based on personal knowledge because it is based entirely on

counsel's own interpretation of the evidence in the record"); *Little v. City of New York*, 487 F.

Supp. 2d 426, 433 n.2 (S.D.N.Y. 2007) ("The law is clear that an attorney's affirmation that is

not based on personal knowledge of the relevant facts is to be accorded no weight on a motion

for summary judgment.").   Standing alone, the KISS Loan Summary is too ambiguous for the

Court to conclude that the "DOCS BACK" date represents the date on which the *loan documents*

were returned to Money Source.  Because the Court "must resolve all ambiguities and draw all

reasonable inferences against the moving party," the Court finds that there are genuine issues of

material fact as to whether Money Source is entitled to any set-offs from the base commissions

owed to Steve.  *See Linda Chun,* 2021 WL 216073, at *2 (citation omitted).

Accordingly, the Court respectfully recommends to Judge Brown that Money Source's

motion for summary judgment on its defense of set-off and Steve's breach of contract claim be

DENIED.

### ii.    Maria Keegan

Money Source contends that Maria is not owed any base commissions.  *See* Def.'s Mem.

at 24-25.  According to Money Source, not only was Maria paid the base commissions she was

entitled to, but she received an excess of $301.70 in base commissions for November 2016 for

which Money Source is entitled to a set-off.  *Id*.  Maria's commission spreadsheet reflects one loan for which she received a base commission in the amount of $301.70 at the rate set forth in the Loan Officer Commission Schedules.[12]  *See* Commission Spreadsheet for Maria Keegan, Gionis Decl., Ex. X [DE 53-27] at 2.  Pointing to the KISS Loan Summary for this loan, Money Source maintains that the loan was funded after Maria's termination on November 4, 2016, and she was therefore only entitled to half her base commission on the loan under the Compensation Agreement.  *See* Def.'s Mem. at 24-25.  The KISS Loan Summary for the loan demonstrates that it was indeed funded within 30 days after Maria's termination.  *See* KISS Loan Summaries for Maria Keegan, Gionis Decl., Ex. U [DE 53-24] at 3.  However, for the same reasons discussed above, the Court finds that there are issues of fact whether Money Source is entitled to a set-off in the amount of $301.70.

Irrespective of whether it is entitled to a set-off, Money Source nonetheless demonstrates that Maria is not owed any base commissions, and therefore cannot sustain a breach of contract claim.[13]  Maria's earning statement for the pay period between November 13 and November 26,

---

[12]    The loan at issue is loan number 3057993.  *See* Commission Spreadsheet for Maria Keegan, Gionis Decl., Ex. X at 2.  Because Maria closed fewer than 10 loans in November 2016, her base commissions were computed at a rate of 40 basis points under the Loan Officer Commission Schedule.  *Id.*; *see also* Loan Officer Commission Schedule for Maria Keegan, Gionis Decl., Ex. J at 2.

[13]    If Money Source is ultimately entitled to a set-off, it may arguably be applied to the total judgment, if any, received by Maria in this action.  Courts which recognize set-off as a counterclaim have noted that "setoff enables a defendant to reduce the judgment due to a plaintiff by the amount the plaintiff owes that defendant on a different claim." *Trustees of Local 8A-28A Welfare Fund v. Am. Grp. Administrators*, No. 14-CV-1088, 2017 WL 9481111, at *23 (E.D.N.Y. Aug. 28, 2017), *report and recommendation adopted sub nom. Trustees of the Local 8A-28A Welfare Fund v. Am. Grp. Administrators*, No. 14-CV-1088, 2017 WL 4381663 (E.D.N.Y. Sept. 28, 2017) (citing *Arch Ins. Co.*, 584 F.3d at 42 (setoff is a "counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim"); *Valley Disposal Inc. v. Cent. Vermont Solid Waste Mgmt. Dist.*, 113 F.3d 357, 365 (2d Cir. 1997) ("The effect of a setoff ... is to reduce the size of the judgment entered in the plaintiff's favor.")).

2016 indicates that she received a payment for a draw in the amount of $1,087.50. *See* Earning Statements for Maria Keegan, Gionis Decl., Ex. S [DE 53-22] at 2. Her commission spreadsheet reflects that she earned base commissions in the amount of $2,181.68 for loans funded within 30 days after her termination, excluding any alleged set-off. *See* Commission Spreadsheet for Maria Keegan, Gionis Decl., Ex. X at 2. Maria's earning statement for the pay period between November 1 and November 30, 2016 indicates that she received a payment for commissions in the total amount of $1,094.18, which reflects the base commissions she earned in November 2016 ($2,181.68) reduced by the draw taken ($1,087.50) in that same month. *See* Earning Statements for Maria Keegan, Gionis Decl., Ex. S at 3. As such, the evidence submitted by Money Source supports a finding that Maria was paid the base commissions she was entitled to for loans which funded within 30 days after her termination.

Instead of submitting evidence of their own to rebut Money Source's evidence, Plaintiffs simply imply that the evidence relied upon by Money Source is somehow unreliable. *See* Pls.' Opp'n at 25-26. Maria states in her declaration that she "do[es] not have any record of receiving any draw for $1,087.50 in November 2016 from Money Source."[14, 15] Maria Decl. ¶ 13. She further states that she "did not receive any commission statements or earning statements from … Money Source while [she] worked there or when [she] was terminated." *Id*. ¶ 15. First, Maria's

---

[14]     Maria acknowledges that she received "a draw payment on November 4, 2016" but maintains that this "was [her] bi-monthly payment for the weeks of October 16 and October 23, 2016." *Id*. ¶ 14.

[15]     Maria's receipt of this payment, or lack of receipt, goes directly to her breach of contract claim and could have been explored during discovery. The earning statements were produced to Plaintiffs during discovery and reflect the check numbers of the payment made to Plaintiffs. To the extent Plaintiffs intended to dispute receiving the payments reflected in the earning statements, Plaintiffs could have requested, among other things, banking records from Money Source which would demonstrate whether the checks were deposited.

assertion that she lacks any record of receiving a payment for a draw does not by itself create a genuine factual dispute as to whether she received this payment.  "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with *specific evidence* demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (emphasis added).  "[S]pecifically, [the opposing party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir.2011) (internal citations and quotation marks omitted).  Moreover, "a nonmoving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." *Wheeler v. Kolek*, No. 16-CV-7441, 2020 WL 6726947, at *8 (S.D.N.Y. Nov. 16, 2020) (citing *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016)).

Second, although Maria may not have received the earning statements submitted by Money Source, she does not assert any facts or submit any evidence that calls into question the authenticity of the earning statements submitted by Money Source.  Admittedly, there is a question as to the admissibility of the business records relied upon by Money Source in support of its summary judgment motion.  "A movant who relies on business records must introduce those records in a manner, typically through a custodian's affidavit, that identifies them and establishes that they are admissible under Federal Rule of Evidence 803(6)." *Ravenell v. Avis Budget Grp., Inc*., No. 08-CV-2113, 2014 WL 1330914, at *2 (E.D.N.Y. Mar. 31, 2014) (citing *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc*., No. 04-CV-2293, 2007 WL 74304, at *3 (E.D.N.Y. Jan. 8, 2007) ("[W]hen offering business records in support of a motion for summary judgment, in order to avoid the bar against hearsay, the offering pay

should present an affidavit 'from a document custodian' that 'explain[s] whether [the records] were kept in the ordinary course of business,' although that person 'need not have personal knowledge of the actual creation of the document.'") (citation omitted)).  Although Money Source has not submitted the earning statements, along with the other business records relied upon in proper evidentiary form, "[i]t is well-established that even inadmissible evidence may properly be considered on summary judgment if it may reasonably be reduced to admissible form at trial."  *Perpall v. Pavetek Corp.*, No. 12-CV-0336, 2017 WL 1155764, at *9 (E.D.N.Y. Mar. 27, 2017) (quotations omitted); *accord Young v. Cabrera*, No. 18-CV-3028, 2020 WL 7042759, at *7 (E.D.N.Y. Nov. 30, 2020) (citation omitted).

Here, there is no reason to conclude that Money Source will not be able to provide the necessary certification or an authenticating witness at trial.  To the contrary, "[a] review of the … records submitted by [d]efendant[] in this case reveals nothing that would indicate a lack of trustworthiness."  *Id.* at *8. "Their appearance, contents, and substance are what one would expect of such records and support [defendant's] claim that they are what they appear to be."  *Id.; see also Young*, 2020 WL 7042759, at *7 (considering unsworn medical or hospital records submitted by defendants because nothing indicated lack of trustworthiness and appearance of records were what one would expect of such records); *Hutch Enterprises, Inc. v. Cincinnati Ins. Co.*, No. 16-CV-1010, 2017 WL 3601899, at *4 (W.D.N.Y. Apr. 12, 2017) (considering engineering and industry professional reports on summary judgment even though they were not accompanied by proper affidavit under Federal Rule of Evidence 803(6)); *Evans v. Consumer Info. & Dispute Resolution*, No. 05–CV–8252, 2006 WL 1209904, at *4 n.5 (S.D.N.Y. May 5, 2006) (considering unsworn medical records submitted by Plaintiff because nothing indicated lack of trustworthiness).  Based on the evidence submitted by Money Source,

the Court finds that although there are issues of fact whether Money Source is entitled to a set-off in the amount of $301.70, there are no issues of fact as to whether Maria is entitled to commissions on loans which loans funded within 30 days after her termination.

Accordingly, the Court respectfully recommends to Judge Brown that Money Source's motion for summary judgment be DENIED as to its defense of set-off, but GRANTED as to Maria's breach of contract claim.

### iii.    Richard Hernandez

Money Source concedes that Steve is owed a total of $1,815.26[16] in override manger commissions earned in October and November 2016, but contends that this amount must be set-off by an overpayment of manager override commissions, in the total amount of $1,163.35, made to Richard in October 2016 on loans which were generated by loan officers who were not under his direct supervision.  Def.'s Mem. at 25-27.  Richard's October 2016 commission spreadsheet reflects 15 loans for which he received manager override commissions in the total amount of $1,458.49. *See* Commission Spreadsheets for Richard Hernandez, Gionis Decl., Ex. Y at 2. Money Source submitted an earning statement for the pay period of October 1 to October 31, 2016 which reflects that Richard received a payment for commissions earned that month in the amount of $1,458.48.  *See* Earning Statement for Richard Hernandez, Gionis Decl., Ex. V at 2. Citing Richard's October 2016 commission spreadsheet and earning statement, Money Source asserts that "Richard received manager overrides derived from loan officers that did not work under Richard as a manager, representing an overpayment of $1,163.55."  Coh-Prospero Aff.

---

[16]     This amount consists of: (1) $209.66 in manager override commissions earned on loans generated by Maria which funded in October 2016; and (2) $1,605.60 in manager override commissions earned on loans generated by Maria and Steve which funded in November 2016. Def.'s Mem. at 26.

¶ 12 (citing Earning Statement for Richard Hernandez, Gionis Decl., Ex. V and Commission Spreadsheets for Richard Hernandez, Gionis Decl., Ex. Y); Def.'s Mem. at 26 (same).  However, Money Source does not specifically identify which of the loans listed in the October 2016 commission spreadsheet were generated by loan officers who were not supervised by Richard.

Having independently reviewed the commission spreadsheet, the Court observes that it reflects 12 loans[17] which were neither generated by Steve or Maria on which Richard received manager override commissions in the total amount of $1,163.35.  *Id*.  However, the record indicates that Richard "managed 3 individuals" while employed as a retail sales manager at Money Source.  Richard Decl. ¶ 4.  Neither party clarifies the identity of this third individual or whether this individual is among the loan officers who generated any of the 12 loans on which Richard allegedly received an overpayment of manager override commissions.  Money Source's conclusory assertion that "Richard received manager overrides derived from loan officers that did not work under Richard as a manager," without any further details or support from specific evidence in the record does not adequately demonstrate that Money Source is entitled to a set-off for the 12 loans at issue.  Although minimal additional evidence is needed to demonstrate that the 12 loans were indeed generated by loan officers who were not directly supervised by Richard, without it, there is too much ambiguity surrounding the third loan officer Richard purportedly managed and whether this loan officer generated any of the 12 loans forming the basis of Money Source's set-off defense as it applies to Richard.  Because the Court "must

---

[17]    These 12 loans include loan numbers 3056850, 3057710, 3056262, 3056561, 3056710, 3055832, 3056123, 3056463, 3056587, 3056645, 3057153, and 3057338.  *See* Commission Spreadsheet for Richard Hernandez, Gionis Decl., Ex. Y at 2.  Because Richard's team closed loans in the aggregate volume up to and including $10 million, his manager override commissions were computed a rate of 3 basis points (0.0003 or 0.03%).  *Id.*; *see also* Sales Manager Commission Schedule, Gionis Decl., Ex. G at 2.

resolve all ambiguities and draw all reasonable inferences against the moving party," the Court finds that there are genuine issues of material fact as to whether Money Source is entitled to a set-off from the manager override commissions owed to Richard.  *See Linda Chun*, 2021 WL 216073, at *2 (citation omitted).  Accordingly, the Court respectfully recommends to Judge Brown that Money Source's motion for summary judgment on Richard's breach of contract claim be DENIED.

For the foregoing reasons, the Court respectfully recommends that Money Source's motion for summary judgment be:  (1) DENIED as to Money Source's defense of set-off; (2) DENIED as to Steve and Richard's breach of contract claim; and (3) GRANTED as to Maria's breach of contract claim.

## V.    CONCLUSION

For the foregoing reasons, the Court respectfully recommends to Judge Brown that Defendant The Money Source Inc.'s motion for summary judgment be DENIED as to Plaintiffs' fraudulent inducement claim (Count I), DENIED as to Plaintiffs Steve Hernandez and Richard Hernandez's breach of contract claim (Count III), GRANTED as to Plaintiff Maria Keegan's breach of contract claim (Count III), and DENIED as to Defendant The Money Source Inc.'s defense of set-off.

## VI.    OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See* Fed. R. Civ. P. 6(a), (e).  Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF.  Any objections by a *pro se* party shall be filed with the Clerk of the Court by overnight mail or regular mail.  **A courtesy copy of any objections**

**filed is to be sent to the Chambers of the Honorable Gary R. Brown.  Any requests for an extension of time for filing objections must be directed to Judge Brown prior to the expiration of the fourteen (14) day period for filing objections**.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

<b>SO ORDERED.</b>

Dated: Central Islip, New York
     March 5, 2021

/s/ A. Kathleen Tomlinson<br>A. KATHLEEN TOMLINSON<br>U.S. Magistrate Judge