UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

RICHARD HERNANDEZ, STEVE            :        Case No.: 2:17-cv-06919 (GRB)
HERNANDEZ, AND MARIA KEEGAN,        :
                                    :
            Plaintiffs,             :
                                    :
     v.                             :
                                    :
THE MONEY SOURCE INC.,              :
                                    :
            Defendant.              :

------------------------------------------------------------x

## DEFENDANT'S MOTION *IN LIMINE* NO. 10 TO PRECLUDE EXPERT REPORT AND TESTIMONY OF DR. STEVEN SHAPIRO

### PRELIMINARY STATEMENT

Defendant The Money Source Inc. ("Defendant" or "TMS") moves to preclude the expert report and testimony of plaintiffs' economic expert, Dr. Steven Shapiro ("Shapiro"). In this lawsuit, plaintiffs RICHARD HERNANDEZ ("Richard") and STEVE HERNANDEZ ("Steve," collectively, the "Hernandez Brothers") claim that they were fraudulently induced by TMS to quit their jobs at New Penn Financial LLC ("New Penn") and join TMS in the summer of 2016, and that, after being terminated by TMS, their compensation since joining United Mortgage Corporation ("United") in November 2016 has been permanently impaired.

In support of their damages claim, the Hernandez Brothers submitted Shapiro's "updated" expert report, dated December 3, 2021 (the "2021 Shapiro Report"), having previously submitted his November 7, 2019 report ("2019 Shapiro Report"). The 2021 Shapiro Report and Shapiro's testimony should be precluded because, based on Shapiro's admissions, it is unreliable and cannot assist the jury.

In both 2019 and 2021, Shapiro constructs two hypothetical scenarios for purposes of projecting the Hernandez Brothers' alleged lost compensation. For alleged future losses, Shapiro projects what the Hernandez Brothers would have made had they continued to work at New Penn from November 2016[1] and what they can be expected to earn at United. For alleged "past lost compensation," Shapiro compares the hypothetical New Penn compensation with actual compensation at United. Shapiro then calculates the purported difference in compensation, and, for alleged future lost compensation, he discounts to present value.

The 2021 Shapiro Report, rather than merely update the 2019 report, is, in reality, a new report with a wholly new, novel hypothesis that projects the Hernandez Brothers' hypothetical New Penn compensation based on the "year-to-year % change in the volume of originated residential mortgages." The 2021 Shapiro Report, thus, uses country-wide originations in the retail residential mortgage market to project the Hernandez Brothers' compensation in the labor market. Shapiro assumes a one-to-one ("1:1") correlation between the two, *i.e.*, between retail residential mortgage originations and compensation. Shapiro does this even though he concedes that he has no support for his assumption, has never tested his assumption, and would need additional information, including an "overall aggregate compensation in the industry" in order to "do an analysis" to actually determine "the correlation" between "mortgage originations" and compensation, if any. Thus, Shapiro fails to provide any scholarly research, empirical research or any other reliable analysis supporting his conclusion. He just says it.

Also, Shapiro concedes that his conclusory methodology, because it is based on the volatile mortgage originations market, results in projections as to future compensation that are largely

---

[1] This is, itself, a shaky foundation as New Penn was sold to New Rez in July 2018. *Infra.* All exhibits referenced herein are annexed to the accompanying Declaration of Michael C. Mulè unless otherwise stated.

dependent on the fortuity of when this case goes to trial. In this regard, Shapiro conceded that his projections of the Hernandez Brothers' future lost compensation "would be significantly lower" if this case came to trial in 2019. In this regard, as explained below, Shapiro projected the Hernandez Brothers' hypothetical compensation at New Penn between 2016 and 2021 based on the volatile and extraordinary rise in mortgage originations during that time period. Then, after this calculation, he applied a steady 3.8% annual increase into the future, adding the power of compounding to inflated numbers.

Shapiro's methodology is based on nothing more than his *ipse dixit*. It is the quintessential "net opinion." Therefore, Shapiro's proffered projections are not merely "shaky"; they are utterly unreliable, speculative and unhelpful for a jury.

Notably, the 2021 Shapiro Report veered from a traditional economic analysis, as contained in his 2019 report. The 2019 Shapiro Report used traditional labor market statistics and computed annual growth rates based on average growth in median salaries for male credit counselors and loan officers employed full-time by age-group as compiled by the United States Bureau of the Census, 2013-2017 American Community Survey Public Use Microdata.

It is understandable why Shapiro deviated from the traditional analysis contained in his earlier report … because, by 2020, the Hernandez Brothers' *actual* income at United exceeded the projections in the 2019 Shapiro Report for the Hernandez Brothers' hypothetical compensation at New Penn had they continued to work there. Thus, the benchmark that Shapiro used in 2019 to project the Hernandez Brothers' lost compensation, itself, established that there was no loss at all. So, Shapiro had to come up with a new construct – giving rise to the 2021 Shapiro Report. However, Shapiro's new construct is unreliable, and therefore, his new report and testimony must

be excluded. Also in support of this motion, TMS submits the accompanying Declaration of its

expert, Debra Sabatini Dwyer, Ph.D. ("Dwyer Decl.").

**STATEMENT OF RELEVANT FACTS**

In both the 2019 and 2021 Shapiro Reports,[2] Shapiro recites the following background:

> In July 2016, Richard Hernandez was employed as a senior sales manager at New Penn Financial, where he had worked for approximately seven years. As a senior manager, Richard Hernandez had a team of loan officers reporting to him. He earned a mix of salary and commissions, including override commissions based on the productivity of his team members.
>
> In July 2016, Steven Hernandez was part of Richard Hernandez's team at New Penn Financial. Steven Hernandez had been employed at New Penn Financial for approximately 3 and 1/2 years. Mr. Hernandez earned a mix of salary and commissions.
>
> Steven Hernandez left New Penn Financial and joined the Money Source as a loan officer on August 22, 2016. Richard Hernandez left New Penn Financial on September 12, 2016 to join the Money Source as a retail sales manager. Part of the team that Richard Hernandez supervised at New Penn Financial included Steven Hernandez.
>
> Richard Hernandez and Steven Hernandez were terminated by the Money Source on November 4, 2016. Following their terminations by the Money Source, Richard Hernandez and Steve Hernandez joined United Mortgage Corporation, where they are still employed. Richard Hernandez has a sales manager position at United Mortgage and Steven Hernandez is a loan officer reporting to Richard Hernandez.

(Ex. "A" at 2 and Ex. "B" at 2).

In both reports, Shapiro computed "lost compensation" under the "assumption that but-for

the claims in this case," they "would have continued to earn compensation comparable to what

they earned at New Penn Financial." Shapiro explains:

> For Richard Hernandez and Steven Hernandez, lost compensation is measured as the difference between projected cash compensation had each remained at New Penn Financial and cash compensation from the Money Source and United Mortgage. Damages are computed from the specific dates that Richard Hernandez and Steven Hernandez began to work at the Money Source, Inc. through the remainder of their projected work lives.

---

[2] When referring to the 2019 Shapiro Report, we refer to the "corrected" expert report concerning the Hernandez Brothers that Shapiro submitted in November 2019.

(Ex. "A" at 2 and Ex. "B" at 2-3). In both reports, Shapiro used the same source for projecting the Hernandez Brothers' respective work lives. But, in making projections as to the "cash compensation had each remained at New Penn Financial," the 2019 and 2021 Shapiro reports are starkly different.

<u>The 2019 Shapiro Report and 2019 Deposition</u>

The 2019 Shapiro Report projected the Hernandez Brothers' annual growth in New Penn compensation by utilizing "the annual average growth in median salaries for male credit counselors and loan officers employed fulltime by age group from the United States Bureau of the Census, 2013-2017 American Community Survey Public Use Microdata set as compiled by Expectancy Data." (Ex. "A" at 4-5). Then, he applied inflation rates of 2.1% in 2017, 2.4% in 2018 and 2.1% in 2019 and beyond, using the "Consumer Price Index data … from United States Department of Labor, Bureau of Labor Statistics, https://data .bls.gov/PDOWeb/cu. *Id.*

Based on these sources, Shapiro projected what the Hernandez Brothers would have earned in cash compensation had they remained at New Penn. He compared that to their actual earnings at United through 2017 and projected earnings at United thereafter in calculating the Hernandez Brothers' alleged losses.

At his 2019 deposition, Shapiro explained his rationale for using the United States Bureau of the Census, 2013-2017 American Community Survey Public Use Microdata set as compiled by Expectancy Data. The following questions and answers were provided:

Q. Again, was there any resort to any outside metrics earning capacity tables, things of that nature?

A. Well, the only outside metrics, and they're cited in my report, were work life statistics. I used data on earnings by age for loan officers that are cited in the report to project their earnings, as well as applying future inflation to that since typically -- typically in the labor economics literature, earnings grow with age because age is a proxy for gaining further experience.

When you hit a plateau as you get older -- you hit a plateau as you get older where you're not going to see much in terms of age related growth and may actually be a decline after that which is the case --

Q. Sure.

A. -- with loan officers.

So I basically have higher growth initially and then the growth tails off as they get older, factoring in the effects of age and then I also factor in inflation and that's all based on outside statistics on loan officers from the American Community Survey.

(Ex. "C" at 70:18 through 71:22).

The 2019 Shapiro Report, thus, projected the Hernandez Brothers' earnings based on long-established work life statistics and "data on earnings" used by economists as Shapiro explained whereby an individual's income is expected to have a period of growth, followed by a plateau, and eventually a decline.[3]

<u>The Hernandez Brothers' Actual Earnings At United Compared to 2019 Projections</u>

By 2021, the projections contained in the 2019 Shapiro Report proved to be inaccurate in that Shapiro underestimated what the Hernandez Brothers would earn at United. In fact, those earnings eventually eclipsed Shapiro's benchmark projections, *i.e.*, what the Hernandez Brothers would have earned in cash compensation had they remained at New Penn. As a result, Shapiro had to come up with a new model to substantiate the Hernandez Brothers' claims of damages.

The following compares Shapiro's 2019 projections as to what the Hernandez Brothers would have earned in cash compensation had they remained at New Penn with the Hernandez Brothers' actual earnings at United from 2017 through 2020:[4]

---

[3] The annual growth rates were 1.3% through 2024. Those rates increased to 5.9% from 2024 through 2029, decreasing thereafter to 1.7% through 2034, and then to 1% or lower.

[4] Earnings records for 2021 were recently provided. As explained in the updated report of Debra Dwyer, PhD, annexed as Exhibit "A" ("Updated Dwyer Report") to the accompanying Dwyer Decl., one of the flaws in Shapiro's 2019 report was that there was no explanation as to why the Hernandez Brothers earned less at United and Dr. Shapiro assumed without explanation that their earning capacity was permanently impaired by their acceptance of employment at TMS.

| YEAR[5] | RICHARD'S NEW PENN PROJECTION | RICHARD'S UNITED EARNINGS | STEVEN 'S NEW PENN PROJECTION | STEVEN'S UNITED EARNINGS |
|---------|-------------------------------|---------------------------|-------------------------------|--------------------------|
| 2017 | $306,511 | $127,864 | $131,557 | $88,609 |
| 2018 | $326,706 | $136,958 | $140,224 | $92,796 |
| 2019 | $346,983 | $200,759 | $148,927 | $121,119 |
| 2020 | $351,486 | $377,954 | $150,860 | $263,051 |

(Ex. "A" at Exhibits 2-4 therein, and Ex. "B" at Exhibits 2-4 therein).

As is clear, by 2020, the actual earnings of the Hernandez Brothers at United surpassed, and in Steven's case, dwarfed, what Shapiro had projected their earnings to be in 2020 had they stayed at New Penn (Richard: $377,954 vs. $351, 486; Steven: $263,051 vs. $150,860), and those actual earnings far exceeded Shapiro's 2019 projections for earnings at United in 2020 and 2021. *Id.*; *see also*, Ex. "D" at 61:13 through 63:17; 67:14-18). On January 5, 2022, Shapiro testified:

Q. So for 2020, your projection, 351,486 for New Penn and 146,626 at United Mortgage, correct?

A. Yes.

Q. Okay. And going back to your updated report from December 3rd, at page 3, we know that at United Mortgage, for 2020, Richard actually made 377,954, correct?

A. That's correct.

Q. So his earnings at United Mortgage were nearly 2.6 times higher than what you projected in 2019, correct?

A. That's correct.

Q. Your projection was not even close there. Is that a fair estimate?

A. That's correct.

---

[5] For 2016, Shapiro projected that Richard would have earned $288,444 if he stayed at New Penn. From September 12, 2016 through the end of the year, Shapiro projected that Richard would have earned $87,479, as compared to $44,701 earned at TMS and then United. For 2016, Shapiro projected that Steven would have earned $123,802 if he stayed at New Penn. From August 22, 2016 through the end of the year, Shapiro projected that Steven would have earned $44,650 as compared to $40,591 earned at TMS and then United.

Q. Is it true that if you applied the growth rates that you used in your 2019 report, Richard Hernandez's earnings at United Mortgage would have caught up to that of what you projected for New Penn by 2020?

A. If I used that -- if I used that method, if I used those growth rates from the prior report, that's correct. But those growth rates don't factor in the increases in -- the large increases in mortgage originations that have occurred in 2019 and 2020.

Q. Okay. So just so that I – I understand it, if you had used the – the growth rates and the methodology that you used in 2019, Richard Hernandez's earnings at United Mortgage would have caught up to United -- I'm sorry -- at United Mortgage -- would have caught up to what he would have earned at New Penn by 2020. Is that a correct statement?

A. I believe so. But I would need to see the -- I would need to consult the table from the other report, because I don't have that in front of me.

Q. Okay. Okay. Here is the 2019 report and going to the table. So 2020, New Penn projection, 351,486. You projected United Mortgage at 146,626. But as we just saw, he actually made 377,954 at United Mortgage in 2020. So based on that, if you had used the same methodology that you used in 2019 and the growth rates that you used in 2019, his earnings at United Mortgage would have caught up to those of New Penn by 2020, correct?

A. That's correct. If I used the growth rates in the November 9th, 2019, report, yes.

(Ex. "D" at 61:13 through 63:17).

Thus, under the model used in 2019, as of 2020, the Hernandez Brothers sustained no losses – even if they could establish liability.

The 2021 Shapiro Report And Shapiro's January 2022 Testimony Regarding It

Not surprisingly based on these facts, the 2021 Shapiro Report makes no mention, whatsoever, of the 2019 Shapiro report. Rather than update facts, the 2021 Shapiro Report is, in reality, a new report.

In the 2021 Shapiro Report, to project earnings, Shapiro jettisoned his prior reliance on the 2013-2017 American Community Survey Public Use Microdata set as compiled by Expectancy Data for median salaries for male credit counselors and loan officers. Instead, to project what the Hernandez Brothers would have earned in cash compensation had they remained at New Penn,

Shapiro "applied the following annual growth rates: -13.6 percent in 2017, -7.6 percent in 2018, 41.9 percent in 2019 and 71.8 percent in 2020." (Ex. "B" at 3-4). He noted: "The annual growth rates are equal to the year-over year percent change in the volume of originated residential mortgages, as reported by in the Federal Housing Finance Agency National Mortgage Database." (Ex. "B" at 3-4, fns. 4 and 15).

After applying those volatile growth rates through 2020, Shapiro applied a projected a steady 3.8 annual increase, using the "average annual percent change in the volume of originated residential mortgages from 2001 to 2020" as "obtained from the Federal Housing Finance Agency National Mortgage Database." (Ex. "B" at 3-5, fns. 5, 12, 16 and 23).

Shapiro also abandoned his prior reliance on "work life statistics" and "data on earnings," whereby an individual's income is expected to have a period of growth, followed by a plateau, and eventually a decline. In his 2021 report, Shapiro projects ever-increasing earnings. (Ex. "B" at Exhibits 2-5 thereto).

Shapiro made several admissions at his January 5, 2022 deposition that establish that his conclusions in his 2021 report are unreliable and should be excluded.

The metrics that Shapiro used in 2019 to project earnings based on the 2013-2017 American Community Survey Public Use Microdata set as compiled by Expectancy Data was "common"; it has "been subjected to peer review countless times"; and "there are numerous publications that rely upon" it (Ex. "D" at 8:21 through 9:22). Despite this fact, Shapiro abandoned that metrics because "it was my belief that" such metrics did "not capture what has been going on … with loan originations and … with residential home sales" since 2019. (Ex. "D" at 11:2-3, 11:14 through 12:3).

Shapiro testified that he now "think[s]" or "believes" that the "annual growth rates are equal to the year-over year percent change in the volume of originated residential mortgages, as reported by in the Federal Housing Finance Agency National Mortgage Database" is "more appropriate to use " to project earnings than it is to rely on the 2013-2017 American Community Survey Public Use Microdata set as compiled by Expectancy Data because the Hernandez Brothers' compensation "is primarily commission-driven and commissions are based on the volume of mortgages" originated (Ex. "D" at 13:19-25, 14:5-18, 14:19 through 15:11).

Shapiro, however, could not point to any scholarly research, empirical research or any other reliable research, analysis, or data to support his belief, or to provide any reasonable basis to conclude that Shapiro's belief is reliable. Rather, his numerous concessions establish that his belief – that the Hernandez Brothers' earnings should be projected based on a "one-to-one" comparison with year-to-year changes in volume of originated residential mortgages industry-wide ("Market Growth," Ex. "D" at 36:2 through 37:7) – is not reliable, or even rational.

In this regard, Shapiro conceded that, never before this case, had he ever used changes in volume of originated residential mortgages as a metrics to project compensation. (Ex. "D" at 14:1-4).

Critically, it is clear from Shapiro's testimony that his assumption of a "one-to-one correlation" between the Hernandez Brothers' earnings' growth and Market Growth is supported by no more than his "say-so." (Ex. "D" at 36:5 through 41:20). Shapiro admitted that he never did what would be required to test whether his assumption of such a 1:1 correlation is appropriate. (Ex. "D" at 37:15 through 38:25). Shapiro testified as follows:

> Q. As an economist, do you have tools to measure whether market growth in an industry is an appropriate gauge for compensation growth in that particular industry?

A. Do I have tools per se? I mean, if -- if I had data on that industry – the only way I could answer that question would be if I had overall aggregate compensation in that industry as well -- I could, then, do a correlation to see what -- I could do an analysis of the correlation with -- with the mortgage originations.

I mean, that would be the tool that one could use if one had that data.

Q. Okay. So hold on. I just want to make sure I understand that. If you had data of the overall aggregate compensation in the industry; is that right?

A. Yes.

Q. And then you would be able to do an analysis of the correlation between that and mortgage originations, correct?

A. That's correct.

Q. And that is not an analysis that you -- you did here; is that right?

A. That's correct.

Q. Can you tell me what factors might alter whether there is a correlation of one-to-one or not?

A. As I'm sitting here right now, I don't know the answer to that. I mean, that -- that would be something that I would have to look at the data and then go from there. But as I'm sitting here now, I don't know what those factors are.

*Id.* Thus, Shapiro admitted that he would need the "overall aggregate compensation in that industry" and then he would have to "do an analysis of the correlation with … the mortgage originations." (Ex. "D" at 37:15 through 38:16). Shapiro also admitted that he did not do such an analysis, that he did not personally conduct any studies, and that he does not even know what factors would alter the correlation, if any, between the Hernandez Brothers' earnings growth and Market Growth in this industry. (Ex. "D" at 38:14-25; *see also*, Ex. "D" at 51:11-18[6]).

---

[6] Shapiro testified:
    Q. And you personally have not done any studies yourself to test the reliability of using the Federal Housing Finance Agency National Data Mortgage base year-over-year percentage change in volume of originated residential mortgages to project earnings growth in this context, correct?
    A. That's correct.
*Id.*

Shapiro conceded that he has not seen Market Growth used to project earnings in this context, *e.g.*, pertaining to senior sales managers and loan officers in the residential mortgage industry. (Ex. "D" at 42:22 through 43:11). Shapiro admitted that he did not locate any scholarly articles, studies or other support by other economists who have used Market Growth to project earnings as he did in his 2021 Report. (Ex. "D" at 43:12-16). Accordingly, Shapiro testified:

> Q. … Number one, I just want to make clear that your report -- it doesn't cite any economist that has used this year-over-year change in volume in a similar context. Is that a fair statement?
>
> A. That's correct.
>
> Q. And you're not relying on any – any economist -- any studies that have relied upon and used the year-over-year change in order to project earnings in the future for a senior loan officer such as Richard Hernandez, correct?
>
> A. That's correct.
>
> Q. Or for a loan officer such as Steven Hernandez, correct?
>
> A. That's correct.
>
> Q. Did you consider any studies that you may not have relied upon but you considered in coming to your opinion and relying upon the year-over-year percentage change in volume of originated residential mortgages in -- in your report?
>
> A. No.

(Ex. "D" at 50:13 through 51:10).

Shapiro also conceded that the mortgage lending industry has a variety of different companies, including publicly-traded and private companies, and that he is not an expert on the mortgage industry. (Ex. "D" at 16:6 through 17:1). Shapiro conceded that he made no distinction as between the differences in employee earnings or profitability among the various mortgage companies (Ex. "D" at 18:5-20).[7] He acknowledged that different mortgage companies might be

---

[7] Shapiro's 2021 report has a whole slew of other deficiencies. For example, it is the entirely premised on the assumption that the Hernandez Brothers would have remained employed by New Penn subsequent to September

more efficient, that he would expect more profitable companies to pay more in wages than less profitable companies, and that he has no understanding of the relative profitability of the companies involved here. (Ex. "D" at 41:10-20 and 44:1-10). Shapiro also made no effort to understand the particular categories of loans primarily handled by the Hernandez Brothers (Ex. "D" at 32:1 through 33:16). None of these factors were considered. (*See, e.g.*, Ex. "D" at 18:5-20; 23:15-21; 41:10-20 and 44:1-10).

What's more, Shapiro conceded that his application of Market Growth as a proxy for earnings growth would result in vastly different results depending on the fortuity of when the case came to trial. In this regard, Shapiro testified:

> Q. Now -- now, the -- the – the industry growth rates that you used, you would agree, those are highly volatile rates; is that correct?
>
> A. Yes. It has been volatile -- it has been volatile in recent years, yes.
>
> Q. Is it correct that if this case, Dr. Shapiro, came to trial in 2019, following two consecutive years of year-over-year percentage change in volume of originated residential mortgages that were negative -- negative 13.6, negative 7.6 and -- if you started in 2019, after those two negative years, using the 3.8 percent growth rate as a steady growth rate going forward, your calculations for the future lost compensation would have been significantly lower than the facts we have today because of the substantial increase in growth in 2020 and 2021?
>
> A. So are you asking me if I used a 3.8 percent annual increase starting in 2019 instead of the actual numbers, would the results have differed? Is that what you're trying to -- I think that's what you're asking me.
>
> Q. Well, that might be -- answer that question.
>
> A. Well, the answer would be, yes, they would differ.
>
> Q. And they would be significantly lower, obviously, right?
>
> A. Yes.

---

2016, but he was aware that New Penn was acquired by Newrez in 2018 and has no knowledge as to whether they would have been impacted by that acquisition. (Ex. "D" at 17:16-21, 22:9-16).

Q. So if this case came to trial in 2019, if you use the methodology that you used in your 2021 report, the projections for future lost compensation would be totally different?

A. Yes.

(Ex. "D" at 47:4 through 48:15).

Shapiro, thus, tacitly conceded that his application of Market Growth as a 1:1 proxy for earnings growth in these circumstances was not grounded on any reliable principles and methods as he conducted no analysis or studies to determine whether Market Growth is an appropriate gauge and found no support for its use in this industry. He also conceded that his compensation projections for twenty years into the future would have been "significantly lower" if those projections were made during a period of market contraction. As explained below, since none of the badges of reliability are present, Shapiro's 2021 Report and testimony must be excluded.

Beyond this, the accompanying Updated Dwyer Report painstakingly goes through the flaws in the 2021 Shapiro Report and explains why it is unreliable. In short, the methodology used by Shapiro, is not standard, has no scholarly support and is untested. *Id.* Indeed, the methodology cannot even withstand a rough empirical test when compared to the Hernandez Brothers' actual earnings. *Id.* Moreover, the 2021 Shapiro Report is internally inconsistent as it uses one category of data from Federal Housing Finance Agency National Mortgage Database to project past lost earnings and another category of data to project future lost earnings, and these are only some of its flaws. *Id.* As explained below, there is simply too great an analytical gap between the data and Shapiro's proffered opinion.

**ARGUMENT**

**POINT I**

**SHAPIRO'S "UPDATED" EXPERT REPORT AND TESTIMONY
REGARDING SAME SHOULD BE EXCLUDED BECAUSE IT IS
NOT A PROPER SUPPLEMENT**

As an initial matter, the 2021 Shapiro Report is identified an "update" to the 2019

Shapiro Report and Shapiro testified it is an "update," but Shapiro concedes that he makes no

reference to the 2019 Shapiro Report (Ex. "D" at 7:11-13, 8:11-20). The 2021 report should be

excluded for this reason, alone, because it is not a proper "supplemental" report in accordance

with Fed. R. Civ. P.26(e)(2). *Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 836 (9th

Cir. 2011) (affirming preclusion of reports because "the new reports were no merely refinements

of previous reports, but were entirely new"); *Welch v. Eli Lilly & Co.*, No. 1:06-cv-0641-RLY-

JMS, 2009 U.S. Dist. LEXIS 21417, *10, *20 (S.D. Ind. Mar. 16, 2009) (granting motion to

strike "supplemental report" because it provided "entirely new analyses" and did not even

incorporate the "original report" and observing that Rule 26(e) does not give "a license to

disregard discovery deadlines and to offer new opinions under the guise of the supplemental

label"). *See also*, *Marine Polymer Techs., Inc. v. HemCon, Inc.*, No. 06-cv-100-JD, 2010 U.S.

Dist. LEXIS 46787 (D.N.H. Apr. 2, 2010) (striking report that introduced "new theories" at late

stage); *Five Star Dev. Resort Communities v. Istar Rc Paradise Val.*, No. 09 Civ. 2085 (LTS),

2012 U.S. Dist. LEXIS 206040, at *13-14 (S.D.N.Y. Dec. 10, 2012) (barring "supplemental

report" because "introduction of a new theory, years into the litigation" would be unfair and

prejudicial).

This Court need go no further to exclude the 2021 Shapiro Report and his testimony

based thereon, but there is more.

**POINT II**

**SINCE SHAPIRO'S METHODOLOGY IS NOT GROUNDED ON SCHOLARLY, EMPIRICAL RESEARCH OR ANY OTHER RELIABLE BASIS, IT MUST BE PRECLUDED**

Even if this Court were not to exclude the 2021 Shapiro Report and his testimony as an utterly improper supplement, Shapiro's opinion is the quintessential "net" opinion. It is based on nothing more than Shapiro's unsupported conclusion that compensation projections for loan officers and senior loan officers in the residential mortgage industry can be based on volatile year over year changes in the volume of residential mortgage originations across the country. As explained below, and in the accompanying papers submitted in support of this motion, Shapiro's opinion is not reliable, and this Court, as gatekeeper, should exclude it.

It is fundamental that "when an expert opinion is based on ... a methodology . . . that [is] simply inadequate to support the conclusions reached, *Daubert* [*v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)] and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

FRE 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.*

"[T]he district court is the ultimate 'gatekeeper'" as to the admissibility of expert testimony. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal citation omitted). As part of its "gatekeeper" function,

16

> the district court must determine whether the proffered testimony has a sufficiently reliable foundation' to permit it to be considered…. In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.

*Amorgianos*, 303 F.3d at 265 (internal quotation marks and citations omitted).

As the Supreme Court recognized in *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997):

> Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* at 146. *See also*, *e.g.*, *Robinson v. Suffolk County Police Dep't*, 08 CV 1874 (AKT), 2011 U.S. Dist. LEXIS 119356, *10 (E.D.N.Y. 2011) (striking expert report and precluding testimony based on expert's testimony, "coupled with the lack of reasoning and methodology behind such testimony"). Thus, "[t]he trial court's gatekeeping function requires more than simply taking the expert's word for it." *Israel v. Springs Indus.*, No. 98 CV 5106 (ENV) (RML), 2006 U.S. Dist. LEXIS 80863, *8 (E.D.N.Y. 2006) (internal quotation marks and citations omitted).

The Supreme Court in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and *Daubert* "identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique 'can be (and has been) tested,' *Daubert*, 509 U.S. at 593; (2) 'whether the theory or technique has been subjected to peer review and publication,' *id*.; (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation,' *id*. at 594; and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community,' *id*." *Amorgianos*, 303 F.3d at 266. "[T]he district court must focus on the principles and methodology employed by the expert …." *Id.* The *Daubert* inquiry was meant "to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Id.* at 267.

Subsequent to *Joiner*, the Second Circuit has "held that 'when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.'" *Ruggiero v Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir 2005) (*quoting Amorgionos* at 266). "To warrant admissibility …, it is critical that an expert's analysis be reliable at every step." *Id.*, 303 F.3d at 267. Certainly, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Amorgianos*, 303 F.3d at 267. But, the court should exclude the evidence "if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id.* (citations omitted). Thus, "shaky but admissible evidence" will not be excluded, but if the expert report and/or testimony is not merely "shaky" but "is unreliable," it should not be admitted. *See, e.g.*, *Israel*, 2006 U.S. Dist. LEXIS 80863, at *6, 28; *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010).

"In short, the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Amorgianos* at 265-66 (*quoting Kumho Tire*, 526 U.S. at 152); *see also*, *Restivo v. Hesseman*, 846 F.3d 547, 577 (2d Cir. 2017) (same). It is fundamental that "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd on other grounds*, 552 U.S. 312 (2008). "As *Daubert* instructs, a methodology is more likely to be reliable if it has been subject to peer review and if it has gained general acceptance in the relevant scientific community." *United States v. Torres*, No. 20cr608 (DLC), 2021 U.S. Dist. LEXIS 91748, at *15 (S.D.N.Y. May 13, 2021) (*citing Daubert*, 509 U.S. at 593-94). "[I]f the witness is relying solely

or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts." *Israel*, 2006 U.S. Dist. LEXIS 80863, at *8 (internal quotation marks and citations omitted).

Net opinions and unsupported assumptions are inadmissible under the Court's gate-keeping function. *See, e.g.*, *Kewazinga Corp. v. Microsoft Corp.*, No. 1:18-cv-4500-GHW, 2021 U.S. Dist. LEXIS 169521, *67 (S.D.N.Y. Sept. 1, 2021) (excluding expert testimony as "the prototypical example of the 'ipse dixit' of the expert" where the expert failed to offer "any sound economic proof of the nature of the market and likely outcomes to support his conclusion that the local search feature was the basis for public demand of the products") (internal quotation marks and citations omitted); *Catherine E. Youngman v Robert Bosch LLC*, No. 11-cv-2521 (SLT) (JO), 2014 U.S. Dist. LEXIS 204528, at *16 (E.D.N.Y. June 16, 2014) (excluding expert report as "unreliable" and "lack[ing] any foundational support" because the expert "makes the conclusory 'net opinion' that … warnings were inadequate, but fails to provide any empirical research or analysis supporting this conclusion"); *Israel*, 2006 U.S. Dist. LEXIS 80863, at *28 (excluding testimony as "speculative" because expert "cites no reliable medical evidence to show a causal connection between" exposure and medical condition and fails to "reference any scientific evidence to support his assumption that" infant "will continue to experience his current symptoms permanently") (internal quotation marks and citations omitted);[8] *Amorgionos*, 303 F.3d at 268-69 and 270 (excluding experts' testimony because as to one expert, the opinion rested on a faulty

---

[8] Certainly, a "trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009) (*quoting Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

assumption and as to the other expert, "there was too great an analytical gap between the conclusions reached by the authors of [the expert's] cited articles and the conclusions that she draws from their work").

The 2021 Shapiro Report and his anticipated testimony must be precluded because it fails on every factor bearing on reliability. As noted in *Amorgianos*, the following are indicia of reliability identified in Rule 702: (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. *Id.*, 303 F.3d at 265. The 2021 Shapiro Report fails in all respects.

The suggestion that the compensation of a loan officer and senior loan officer can, reliably, be projected based on a 1:1 correlation with Market Growth in retail residential mortgage originations is wholly unsupported by facts or data. *See* Dwyer Decl., Ex. "A" thereto. In *Amorgianos*, the Second Circuit in discussing expert opinion on causation noted that the plaintiffs were "required to 'produce expert opinion evidence based on suitable hypotheses ….'" *Id.*, 303 F.3d at 268 (*quoting Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp.2d 147, 160 (E.D.N.Y. 2001)). However, as to his assumption of a 1:1 correlation between Market Growth and compensation growth, Shapiro testified that he would have to do an analysis of the "overall aggregate compensation in that industry" to test "the correlation with … the mortgage originations" but conceded that he never did such an analysis.[9] In addition, Shapiro admitted that his conclusion are not based on empirical data, personal studies, the studies of other economists, or scholarly research.

---

[9] The analysis contained in the 2019 Shapiro Report, which Shapiro abandoned, at least relied upon well-established sources from the United States Bureau of the Census, 2013-2017 American Community Survey Public Use Microdata set as compiled by Expectancy Data." (Ex. "A" at 4-5).

*Kewazinga Corp.* is instructive. *Kewazinga Corp.*, was a patent infringement action pertaining to a particular Microsoft map feature, "Streetside feature," which make it appear as if viewers are standing on the street looking at a particular destination. *Id.*, 2021 U.S. Dist. LEXIS 169521. In *Kewazinga Corp.*, the court excluded the testimony of an expert on search engine marketing, Mr. Smith, who opined that consumers would be far less likely to use the Bing search engine if it did not have a Map feature, and more particularly, a Streetside feature. In that case, the expert "relie[d] on anecdotes, studies done by third-parties and competitors, the presence of investment on the local search feature by Microsoft and its competitors, and Microsoft's internal documents and testimony about how they viewed the importance of the local search feature." *Id.* at *66. The court found that "[n]one of these sources provide a sound reliable method for assessing how" the Streetside feature "would be viewed by consumers without the local search features." *Id.* at *67. The court found:

> Mr. Smith made no effort to discern how often a user affirmatively utilizes the local search feature when using Streetside. This highlights the absence of any economic and factual data necessary for a reliable assessment of the basis for customer demand. He has not offered any "sound economic proof of the nature of the market and likely outcomes" to support his conclusion that the local search feature was the basis for public demand of the products, such as customer surveys or interview asking customers why they selected Streetside.

*Id.* The court found that the expert failed to provide "any **<u>reliable</u>** and tangible evidence to support his opinions about consumer views." *Id.* (emphasis in original). *Kewazinga Corp.* concluded that the expert's opinion "is the prototypical example of the 'ipse dixit' of the expert; that is, a conclusion unsupported and unsubstantiated by any evidence or methodology." *Id.*

The reasons to exclude here are more compelling. Shapiro's conclusions are the antithesis of requirement that expert testimony be the product of reliable principles and methods. Rather, in Shapiro's 2021 Report, Shapiro concededly has nothing to support his opinion, having undertaken no empirical studies, having reviewed no data personally, and having failed to identify any

scholarly analysis or studies by other economists to support his opinion that the compensation of a loan officer and senior loan officer can, reliably, be projected by Market Growth in retail residential mortgage originations and that a 1:1 correlation exists. In fact, here, Shapiro made no effort to justify his assumption of a 1:1 correlation between industry growth and earnings, and a crude empirical test based on the Hernandez Brothers' own earnings did not show such a correlation, and show "significant exceptions where industry growth/decline and earnings growth/decline go in opposite directions." *See* Dwyer Decl., Ex. "A" thereto at p.4.

To paraphrase the Eastern District of New York in a recent case, *Allegra v Luxottica Retail N. Am.*, No. 17-cv-5216-PKC, 2021 U.S. Dist. LEXIS 249124, at *190 (E.D.N.Y. Dec. 13, 2021), as Shapiro "seems to concede himself, his methodology is not a theory or technique that has been 'tested' or 'subjected to peer review,' it lacks an 'error rate,' and it does not appear to be governed by existing scientific standards." *Id.* at *190 (*quoting Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (*citing Daubert*, 509 U.S. at 593-94)).

If this were not enough to establish that Shapiro has not provided any reliable or tangible evidence to support his views as to plaintiffs' projected compensation growth, Shapiro inconsistently applies different categories of data when projecting past lost earnings and future lost earnings, and heo conceded that his own analysis would lead to "significantly lower" compensation projections depending the fortuity of the year the matter was tried.

It is fundamental that "inconsistent results are an 'indicia of unreliability' in an expert's methodologies." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468 (S.D.N.Y. 2018) (*quoting Lippe v. Bairnco Corp.*, 99 Fed. Appx. 274, 279 (2d Cir. 2004)). As explained in *LIBOR*,

> This principle is clearest in the context of inconsistent results produced by the same methodology. *See, e.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F.

Supp. 2d 558, 569 (S.D.N.Y. 2007) (finding "unexplained inconsistency between the results" produced by two iterations of the same methodology to be a basis for exclusion); *United States v. Hermanek*, 289 F.3d 1076, 1097 (9th Cir. 2002) ("Inconsistent results may be an indicator of unreliability.").

*Id.*

Here, as explained by Dr. Dwyer, Shapiro inconsistently used "one category of data from Federal Housing Finance Agency National Mortgage Database to project past lost earnings and another category of data to project future lost earnings." *See* Dwyer Decl., Ex. "A" thereto at p.4. Also, Shapiro conceded that if he began his constant 3.8% annual increase in 2019, rather than in 2021, his projections would be "significantly lower" and if he used the same methodology but this case came to trial in 2019, his "projections for future lost compensation would be totally different" (Ex. "D" at 47:4 through 48:15). For purposes of projecting alleged future lost earnings, these inconsistencies are inexplicable and require exclusion as Shapiro's 2021 Report and opinion is unreliable.

## CONCLUSION

For all the foregoing reasons, it is respectfully requested that this Court grant TMS's motion in its entirety and exclude the 2021 Shapiro Report and Shapiro's testimony because, based on Shapiro's admissions, it is unreliable and cannot assist the jury.

Dated: Lake Success, New York
June 14, 2022

Respectfully submitted,
**MILMAN LABUDA LAW GROUP PLLC**

_  /s Joseph M. Labuda, Esq._
Joseph M. Labuda, Esq.
Michael C. Mulè, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
michaelmule@mllaborlaw.com
*Attorneys for Defendant*